John R. ROY; Gary Waller; David Rhoten; Crystal Galloway; Gary W. Holmes; Eric T. Bushey; M.T. Hammond; John R. Lillard; David H. Dixon; Gary Semones; Richard McManus; Jason Hentz; Patricia H. Dupuis; Curtis Scott Ward; Mike Tanner; Gary A. Seibert; Robert McKeever; John L. Windhorn; Bobby Daggerhart; Melissa P. Harrison; Jay F. Burton; Teresa Hill; Dwight C. Nolff; Thad C. Miller; David W. Shull; David E. David; Patricia H. Barnett; Joseph J. Rooney; Kevin G. Hicks; Robbie Kubler; Dalton E. Shull, Jr.; John V. Ruff, Jr.; Eric McFarland; James Garcia; Cynthia D. Plant; Robert D. McClanahan; George E. Hardy; Fern Jenkins; Mildred H. Miller; Linda W. Semones; Michael K. Kaczmarek; Michael G. Jones; Joey Keisler; Rhett Loudenback; Joseph A. Bastedo, Sr.; David C. Hunter; Loretta Hunter; Betty Koerner; J. Stuart Platt; Evelyn J. Williams; Jacqueline Fink; Jonathon L. Humphrey; Carroll W. Bledsoe, Jr.; Jonathan M. Sebring; Alice H. Bennett; Tony L. Wingard; Kenneth L. White, III; Morris F. Anderson; Stephen C. Sightler; Jeff Barchus; Anthony Bruce Taylor; Tami Leigh Steinlage, Plaintiffs–Appellants,

and

Daniel C. Force; B.L. Burnes; John W. Smith, Plaintiffs,

v.

COUNTY OF LEXINGTON, SOUTH CAROLINA, Defendant–Appellee.

John R. ROY; Gary Waller; David Rhoten; Crystal Galloway; Gary W. Holmes; Eric T. Bushey; M.T. Hammond; John R. Lillard; David H. Dixon; Gary Semones; Richard Mcmanus; Jason Hentz; Patricia H. Dupuis; Curtis Scott Ward; Mike Tanner; Gary A. Seibert; Robert McKeever; John L. Windhorn; Bobby Daggerhart; Melissa P. Harrison; Jay F. Burton; Teresa Hill; Dwight C. Nolff; Thad C. Miller; David W. Shull; David E. David; Patricia H. Barnett; Joseph J. Rooney; Kevin G. Hicks; Robbie Kubler; Dalton E. Shull, Jr.; John V. Ruff, Jr.; Eric McFarland; James Garcia; Cynthia D. Plant; Robert D. McClanahan; George E. Hardy; Fern Jenkins; Mildred H. Miller; Linda W. Semones; Michael K. Kaczmarek; Michael G. Jones; Joey Keisler; Rhett Loudenback; Joseph A. Bastedo, Sr.; David C. Hunter; Loretta Hunter; Betty Koerner; J. Stuart Platt; Evelyn J. Williams; Jacqueline Fink; Jonathon L. Humphrey; Carroll W. Bledsoe, Jr.; Jonathan M. Sebring; Alice H. Bennett; Tony L. Wingard; Kenneth L. White, III; Morris F. Anderson; Stephen C. Sightler; Jeff Barchus; Anthony Bruce Taylor; Tami Leigh Steinlage, Plaintiffs–Appellants,

and

Daniel C. Force; B.L. Burnes; John W. Smith, Plaintiffs,

v.

COUNTY OF LEXINGTON, SOUTH CAROLINA, Defendant–Appellee.

Nos. 97–1731, 97–1798.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 28, 1998.

Decided April 14, 1998.

536

**ARGUED:** James B. Richardson, Jr., Svalina, Richardson & Larson, Columbia, SC, for Appellants. Stephen Terry Savitz, Gignilliat, Savitz & Bettis, Columbia, SC, for Appellee.

ON BRIEF: Gerald F. Smith, Svalina, Richardson & Larson, Columbia, SC, for Appellants. Linda P. Edwards, Gignilliat, Savitz & Bettis, Columbia, SC, for Appellee.

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Judge MURNAGHAN and Judge NIEMEYER joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

Current and former Lexington County Emergency Medical Service (EMS) employees brought this action against the County, alleging that they had been denied overtime pay in violation of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. (West 1978) (the Act). After a bench trial, the district court concluded that the County could not classify the employees as firefighters or law enforcement officers for purposes of calculating their overtime pay, but could exclude their meal periods and sleep periods from hours worked for purposes of this calculation. The court further held that although the County did not qualify for immunity from liability under the Act, the County's good faith precluded an award of liquidated damages to the employees. *Roy v. County of Lexington*, 928 F.Supp. 1406 (D.S.C.1996). Both sides appeal, contesting these and related issues. Finding no reversible error, we affirm.

### I.

EMS is not part of the County's fire or police departments but a separate and independent subdivision of the County's Public Safety Division. EMS paramedics and technicians provide emergency medical care and transportation services throughout the county, which includes nine EMS areas, each averaging 82 square miles. Every EMS area contains an EMS substation, and six of those substations are housed with the area's fire department. The individual substations are manned at all times by a "response team" of two EMS workers.

An EMS team must respond within two minutes after receiving a 911 emergency call requiring EMS assistance. EMS responds to a wide range of emergencies, including domestic accidents and various medical ailments. According to two Lexington County manuals on "standard operating procedures"—one for EMS employees and one for Communications Center workers—EMS teams are "routinely" dispatched to handle such crisis situations as (1) moving patients to a hospital emergency or critical care facility such as a coronary, labor and delivery, or intensive care unit; (2) transporting patients who require life support; and (3) responding to crises at the request of either an EMS supervisor or on-scene crew chief. EMS teams also "routinely support" County law enforcement and fire agencies, but only 25% of the calls are executed in conjunction with law enforcement services and 5% of the calls involve the fire department. Thus, approximately 70% of the calls to EMS are strictly "medical" in that they do not involve either law enforcement or fire protection services.

Following the Supreme Court's decision in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), announcing the applicability of the Act to state and local governments, the County convened a meeting of its top officials to develop a compensation plan to meet the Act's requirements. The County's labor attorney, private practitioner Julian Gignilliat, advised the County officials that the County could pay its EMS workers pursuant to § 7(k) of the Act. Section 7(k) provides a partial exemption for those public agencies employing persons "engaged in fire protection or law enforcement activities," by increasing the number of hours such employees must work above the regular 40–hour workweek before they are entitled to overtime compensation. *See* 29 U.S.C.A. § 207(k) (West 1965 & Supp.1997) (§ 7(k)). Gignilliat also told County officials that they could exclude eight hours per shift for sleep time and two and one-half hours per shift for meals from EMS personnel's compensable hours. Lexington incorporated these recommendations into its overtime policy for EMS employees.

Until 1995, the County paid EMS workers an annual salary in equal bi-weekly installments, which compensated them for up to 86 hours worked every two weeks (43 hours per week); only when EMS personnel worked more than 86 hours were they entitled to overtime pay for those hours. Since July 1, 1995, the County has compensated EMS employees for overtime on the basis of the standard 40–hour workweek, thus paying them overtime for all hours worked in excess of 40 per week or 80 every two weeks.

The County calculates the overtime rate according to the fluctuating workweek method of payment. This results in overtime being paid, on a per-hour basis, at an additional one-half of the employee's regular hourly rate of pay. The County determines the "regular hourly rate" by dividing the bi-weekly salary by the total number of compensable hours an EMS employee works in a two-week pay period. EMS personnel work a "one day on two days off schedule" of three regularly recurring shifts of 24 1/2 hours (8:30 a.m. until 9:00 a.m. on the following day) each week. Each shift cycle repeats itself every 21 days.

Within each shift, EMS workers receive three meal periods: 7:00 a.m. to 7:30 a.m. for breakfast; 1:00 to 2:00 p.m. for lunch; and 6:30 p.m. to 7:30 p.m. for dinner. They need not take their meals at these times; instead they can eat whenever they wish as long as meals do not interfere with answering emergency calls. The County also provides EMS employees with a specified sleep period from 11:00 p.m. to 7:00 a.m. According to County policy, EMS employees "must not be interrupted during meal or sleep times for any reason" except emergency calls. If emergencies disturb any portion of an hour of the meal or sleep periods, the County pays employees for the entire hour. When EMS personnel cannot sleep for five consecutive hours during the sleep period, the County compensates them for the entire eight-hour sleep period.

Sixty-three current and former EMS employees filed this action against the County, alleging that the County's compensation scheme—specifically, its overtime, sleep, and meal policies—violated the Act. Following a bench trial, the district court found that: (1) the County could not calculate EMS overtime hours pursuant to § 7(k), but could exempt EMS employees' uninterrupted sleep and meal periods from total compensable hours; (2) the "fluctuating workweek" payment method did not apply to EMS employees; and (3) the County did not qualify for immunity from liability for past statutory violations because it did not rely on any Department of Labor policy in classifying EMS employees, but that the County's good faith limited the employees' back pay award to two years and foreclosed liability for liquidated damages. *Roy*, 928 F.Supp. at 1413–23.

After being apprised of this Court's decision in *Bailey v. County of Georgetown*, 94 F.3d 152, 156 (4th Cir.1996), the district court reversed itself with respect to the fluctuating workweek issue, holding that the County could employ the fluctuating workweek method in light of *Bailey. See Roy v. County of Lexington*, 948 F.Supp. 529 (D.S.C.1996). The district court then referred the case to a special master for calculation of damages, requiring EMS and the County each to pay half the special master's fees. The court ultimately followed the special master's recommendation, entering a judgment for back pay and prejudgment interest of $136,044.10.

Both the County and EMS raise numerous issues on appeal. We turn first to the County's contentions, and then to those of EMS.

## II.

### A.

The Act generally requires employers to compensate employees at the overtime rate for all work performed over 40 hours per week. *See* 29 U.S.C.A. § 207(a)(1) (West 1985 & Supp.1997). Section 7(k) of the Act, however, provides a partial exemption from this mandate for public agencies engaged in fire protection or law enforcement activities: a public employer need not compensate firefighters at the overtime rate until they have worked an aggregate of 212 hours for a period of 28 consecutive days (53 hours per week), or compensate law enforcement employees at the overtime rate until they have

worked a total of 171 hours for a period of 28 consecutive days (43 hours per week). *See id.;* 29 C.F.R. § 553.230 (1997). For several years, the County paid EMS personnel according to the schedule governing law enforcement officers, *i.e.,* the County did not pay overtime to EMS employees until they worked in excess of 43, rather than 40, hours per week.[1] The County asserts that the district court erred in holding that the County's use of the law enforcement officers' schedule to calculate overtime for EMS workers violated the Act.

### 1.

We note at the outset that the Act itself provides no exemption for EMS workers. To be sure, the Secretary of Labor has promulgated a regulation that permits employers to treat "ambulance and rescue service employees ... as employees engaged in fire protection or law enforcement activities" for purposes of § 7(k) if their services are "substantially related to firefighting or law enforcement activities." 29 C.F.R. § 553.215(a) (1997). The Act, however, does not mention EMS employees, let alone expressly exempt public employers from paying EMS personnel overtime under the normal 40–hour workweek scheme.

Section 7(k) of the Act only exempts from the 40–hour requirement public agency "employees in fire protection activities or ... law enforcement activities (including security personnel in correctional institutions)." 29 U.S.C.A. § 207(k). Indisputably, Lexington County EMS personnel are employed neither "in fire protection activities" nor "in law enforcement activities"; rather, they are employed in emergency medical service activities. Sometimes employees of independent emergency service agencies assist public employees who do engage in fire and law enforcement activities. However, firefighters and police officers are assisted by a myriad of other public employees, including central communication workers, animal control and public health officers, and hospital and correctional employees. If Congress had in-

tended to extend the scope of the § 7(k) exemption to include employees of independent emergency service agencies, it certainly could have done this, as it did with respect to "security personnel in correctional institutions." *Id.* Congress, however, provided no equivalent statutory exclusion for personnel of agencies engaged in "emergency medical response activities."

■ The Supreme Court has repeatedly noted that, "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent." *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910–11, 64 L.Ed.2d 548 (1980) (citing *Continental Cas. Co. v. United States,* 314 U.S. 527, 533, 62 S.Ct. 393, 396, 86 L.Ed. 426 (1942)). No Senate or House report reflects any intent to expand § 7(k) to include EMS personnel whose services are "substantially related to firefighting or law enforcement activities." 29 C.F.R. § 553.215(a). Indeed, the only possible evidence of such legislative intent comes in a brief allusion to EMS personnel found in the congressional debate on § 7(k). During that debate, the ranking member of the House General Labor Subcommittee stated, and the Chairman agreed, that the exemption was intended to cover public employees "engaged in rescue or ambulance activities which are substantially related to fire protection or law enforcement activities." 120 Cong. Rec. 8598 (1974). The remarks of individual legislators, even sponsors of legislation, however, are not regarded as a reliable measure of congressional intent. *See, e.g., West Virginia Univ. Hosp., Inc. v. Casey,* 499 U.S. 83, 98–99, 111 S.Ct. 1138, 1146–47, 113 L.Ed.2d 68 (1991); *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722–23, 60 L.Ed.2d 208 (1979); *United States v. Charleston County Sch. Dist.,* 960 F.2d 1227, 1233 (4th Cir.1992).

To date, no court has found 29 C.F.R. § 553.215(a) unauthorized by § 7(k) and re-

---

1. As of July 1, 1995, the County has compensated EMS personnel based on a 40–hour workweek, and paid them the overtime rate for all hours worked over 40 per week. This appeal thus involves only the period prior to July 1, 1995.

fused to enforce the regulation.[2] *But see Justice v. Metropolitan Gov't of Nashville,* 4 F.3d 1387, 1392 (6th Cir.1993) (finding "some force" supporting conclusion that § 7(k) exemption should not extend beyond statutory categories, *i.e.,* employees in fire protection or law enforcement activities). We need not resolve here whether the few sentences of Congress' debate quoted above provide sufficient evidence of congressional intent to empower the Secretary of Labor to promulgate a regulation broadening § 7(k) to include EMS workers in independent agencies. Even if we give effect to the regulation, the district court did not err in finding that the County had failed to prove that *its* EMS personnel were exempt from the 40–hour requirement.

### 2.

■ In reviewing this finding, we note that the burden is on the County, as the employer, to prove entitlement to the § 7(k) exemption. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97 n. 12, 94 S.Ct. 2223, 2229 n. 12, 41 L.Ed.2d 1 (1974). That burden is not insubstantial. The Supreme Court has directed that the Act must be construed "liberally to apply to the furthest reaches consistent with congressional direction." *Tony & Susan Alamo Found. v. Secretary of Labor,* 471 U.S. 290, 296, 105 S.Ct. 1953, 1958–59, 85 L.Ed.2d 278 (1985). For this reason, all " '[e]xemptions from or exceptions to the Act's requirements,' " including the § 7(k) exemption, " 'are to be *narrowly construed against the employer asserting them.*' " *Monahan v. County of Chesterfield,* 95 F.3d 1263, 1267 (4th Cir.

1996) (quoting *Johnson v. City of Columbia,* 949 F.2d 127, 129–130 (4th Cir.1991)) (emphasis added). Moreover, that "[t]he intent to extend the exemption to ambulance and rescue service employees is not reflected either in the statute itself or in congressional reports related to the statute" has been held as an additional reason for construing "the extension [to EMS personnel] as written into the regulations ... very narrowly." *O'Neal v. Barrow County Bd. of Comm'rs,* 980 F.2d 674, 677 (11th Cir.1993).

■ Guided by these principles, we turn to the regulations and the district court's findings. The regulations provide that the duties of EMS employees will be considered "substantially related" to those of firefighters or law enforcement officers for purposes of the § 7(k) exemption only when the employer proves that:

> (1) the ambulance and rescue service employees have received training in the rescue of fire, crime, and accident victims or firefighters or law enforcement personnel injured in the performance of their respective duties, *and* (2) the ambulance and rescue service employees are *regularly dispatched* to fires, crime scenes, riots, natural disasters and accidents.

29 C.F.R. § 553.215(a) (emphasis added). The district court found that, although EMS personnel had received the necessary training to meet the first prong of this test, the County had not proved that EMS employees were "regularly dispatched to fires, crime scenes, riots, natural disasters and accidents" so as to qualify under the second prong. Our review of this factual finding, which is "necessary to a proper determination of the legal

---

**2.** Another regulation provides that emergency service workers, who are *employed by* the fire department and perform fire control or prevention duties, are to be treated as firefighters for purposes of the § 7(k) exemption. *See* 29 C.F.R. § 553.210 (1997). This regulation is far easier to reconcile with the statutory language of § 7(k). *Alex v. City of Chicago,* 29 F.3d 1235, 1239 n. 3 (7th Cir.1994) (finding statutory term "employees in fire protection activities" ambiguous and thus may properly be construed to include these employees). *See also West v. Anne Arundel County,* 137 F.3d 752 (4th Cir.1998); *Justice v. Metropolitan Gov't of Nashville,* 4 F.3d 1387, 1392 (6th Cir.1993); *Bond v. City of Jackson,* 939 F.2d 285, 287 (5th Cir.1991). The cases interpreting

§ 553.210, however, offer no assistance to the County because the County's EMS workers clearly do not meet that regulation's requirements. Lexington County's EMS employees were not employees of the fire department; on the contrary, it is conceded that EMS is not part of the County's fire department, but rather a separate entity within the Public Safety Division. Only 5% of the Lexington County EMS calls were fire related and the County has never sought to pay EMS personnel as employees engaged "in fire protection activities." In fact, the County paid the EMS workers as employees "in law enforcement activities," a term no court has held ambiguous.

question whether an exemption to the [Fair Labor Standards Act] applies," is limited to determining whether the district court clearly erred. *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 713, 106 S.Ct. 1527, 1529–30, 89 L.Ed.2d 739 (1986).

Neither the Act nor the regulations specifically define the term "regularly dispatched" as it applies here. Indeed, the Department of Labor Wage and Hour Division has opined that, "[t]here is no *specific frequency of occurrence* which establishes 'regularity'" under § 553.215; *"it must be determined on the basis of the facts in each case."* DOL, Wage & Hour Div., Ltr. Rul. (Oct. 9, 1987) (emphasis added). Regulations promulgated pursuant to other sections of the Act, however, sensibly state that "customarily and regularly ... signifies a *frequency which must be greater than occasional but which, of course, may be less than constant."* 29 C.F.R. § 541.207(g) (1997) (emphasis added). This accords with the common sense notion that, even though no fixed frequency alone determines "regularity" under § 553.215, to obtain the benefit of § 7(k), an employer must prove, at a minimum, that EMS workers were dispatched with some frequency to the situations listed in § 553.215.

■ We recognize that interpreting "regularity" to require "some frequency" provides only limited assistance to trial courts. However, we believe that this general guideline best comports with the highly factual nature of the inquiry and the flexible approach set forth in the regulations. In view of the agency's directive that "regularity" is to be decided on the individual facts of each case, we are reluctant to require analysis pursuant to any precise formula. *Cf. O'Neal*, 980 F.2d at 679. Although we find a strict formula unworkable, we do note that "regularity" would seem best proved by two kinds of evidence—evidence that numerous EMS calls were dispatched to § 553.215 emergencies and (or) evidence that many fire or police dispatches include EMS teams.

■ Certainly, demonstrating that generally a substantial number of EMS' total calls were dispatches to "fires, crime scenes, riots, natural disasters and accidents," 29 C.F.R. § 553.215(a), is one way to prove "regularity" of dispatch. In fact, this is the only kind of evidence suggested as probative on this point by the Wage & Hour Division. *See* DOL, Wage & Hour Div., Ltr. Rul. (May 7, 1993). ("Most EMS employees respond to a variety of emergency calls. Some calls are related to law enforcement emergencies, some are related to fire protection emergencies, and some are related to medical emergencies not attributable to either law enforcement or fire protection. Thus, the application of § 7(k) to EMS employees of public agencies that are not an integral part of fire protection or law enforcement agencies must be made on a case-by-case basis in accordance with the criteria discussed above [§ 553.215's two-pronged test]. The results *will necessarily vary depending on the nature of the EMS calls serviced."* (emphasis added.).)

■ In this case, the district court carefully evaluated the "nature of the EMS calls serviced." *Id.* The court found (and the County does not dispute) that the evidence at trial demonstrated that EMS workers were dispatched only 5% of the time in conjunction with fire protection services and 25% of the time with law enforcement personnel. The court further found that nearly 70% of EMS "calls received" were "medical" in that they involved neither fire protection nor law enforcement services. The County introduced *no* evidence that these "medical" calls entailed any of the fire and law enforcement related situations enumerated in § 553.215. Accordingly, the district court could properly infer that 70% of EMS calls "related to medical emergencies, not attributable to either law enforcement or fire protection." *Id.* Indeed, when EMS receives calls that do not involve law enforcement or fire protection services, a court can fairly deduce, absent evidence to the contrary, that the calls do not involve the situations listed in § 553.215— "fires, crime scenes, riots, natural disasters and accidents"—for which presence of fire and law enforcement services would be inevitable. *Cf. Justice*, 4 F.3d at 1399 n. 6 (courts generally should avoid equating EMS dispatch alongside a fire *department* with EMS dispatch to a *fire* under § 553.215).

■ In seeking to counter these undisputed facts, the County relies on two County handbooks, one governing EMS workers and one governing Communications Center employees, and testimony of one of its witnesses explaining those handbooks. The County maintains that this evidence establishes EMS teams were regularly dispatched to § 553.215 situations. We agree that "evidence tending to show that there is a regular procedure, system, or protocol by which ambulance and rescue service workers are notified and dispatched to events relating to firefighting or law enforcement activities," may contribute to satisfying the "regularly dispatched" prong of the substantially related test. *Spires v. Ben Hill County*, 980 F.2d 683, 689 n. 36 (11th Cir.1993). Indeed, if a public employer demonstrates, by any means, that most fire or police department dispatches include EMS teams, even if such calls only comprise a minority of EMS' total calls, then the employer might well be able—depending on the other evidence in the case—to demonstrate that EMS workers were "regularly dispatched" for purposes of § 553.215. Here, however, as the district court noted, the County offered no evidence as to how often fire or police protection dispatches involve EMS teams.

The manuals and testimonial paraphrase of them simply do not address the "regularity" of EMS dispatches to fires and other situations listed in § 553.215. Although the manuals direct EMS teams to "routinely support" fire and law enforcement agencies, they also expressly provide that "agencies who require EMS support on an emergency basis should request" it. The only *specific* occasions for which EMS help is to be "routinely dispatched," according to the manuals, are entirely medical in nature—to move patients to emergency, critical care, coronary care, labor and delivery, and intensive care units, or to transport patients that require life support, or to respond to crises at the request of EMS supervisors or scene crew chiefs. No similar language mandates routine dispatch to situations enumerated in § 553.215. Rather, the manuals include just one reference to specific fire or law enforcement dispatches, stating that EMS workers "shall be dispatched," not to *all* fires, but only to certain "structure fires," namely, those are "working" (not defined) or involve "entrapment or possible entrapment [as] indicated by the caller."

Indeed, how "regularly" EMS teams are dispatched to § 553.215 situations apparently depends on how often individual fire and law enforcement personnel request EMS assistance and whether Communications Center employees determine that assistance is needed. The County produced no evidence as to how often such dispatches occurred. The district court noted this lack of evidence, and found its absence "strong evidence that Lexington County failed to establish 'regularity.'" *Roy*, 928 F.Supp. at 1414. We cannot conclude that this finding constituted clear error.[3]

In sum, given that the County bears the burden of establishing its entitlement to the § 7(k) exemption, which we must narrowly construe against it, and in view of the highly fact-specific nature of the "regularity" inquiry and the evidence presented at trial, we hold that the district court did not clearly err in finding that EMS employees were not exempt under § 7(k) from the 40–hour requirement. Thus, assuming that the § 7(k) exemption can, by regulation, extend to EMS employees of independent agencies, whose activities are "substantially related to firefighting or law enforcement activities," the district court did not err in finding that the County failed to prove that its EMS workers qualified for this exemption.

### B.

■ The County also maintains that, regardless of whether § 7(k) applies to EMS employees, its reliance on legal advice from its attorney rendered it immune from liabili-

---

**3.** The regulations also provide that the § 7(k) exemption does not apply even when EMS employees' activities are substantially related to firefighting or law enforcement activities *if* the employees spend more than 20% of their time engaged in services *unrelated* to either law enforcement or fire protection activities. *See* 29 C.F.R. § 553.212(a) (1997). The district court found that the County had also failed to meet this requirement. *See Roy*, 928 F.Supp. at 1416. In view of our holding, we need not reach this additional question.

ty under the Portal–to–Portal Act, 29 U.S.C.A. § 259 (West 1985). The Portal–to–Portal Act provides:

> [N]o employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay ... overtime compensation ... if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or *any administrative practice or enforcement policy of such agency* with respect to the class of employers to which he has belonged.

*Id.* (emphasis added). The court found that in applying the § 7(k) exemption to EMS workers, the County failed to demonstrate adherence to an established "administrative practice or enforcement policy" promulgated by a government "agency," which would render it immune from liability for any backpay award under the Portal-to-Portal Act.[4]

The statutory command that a "policy" relied on for purposes of Portal–to–Portal Act immunity must be that of an "agency" is echoed in case law and regulations. In *Mayhew v. Wirtz*, 413 F.2d 658, 661 (4th Cir. 1969), we held that this immunity

> is intended to apply only where an employer innocently and to his detriment, followed the law as it was *laid down to him by government agencies,* without notice that such interpretations were claimed to be erroneous or invalid.

*Id.* (emphasis added). Similarly, 29 C.F.R. § 790.19(b) (1997) provides that "the regulations, orders, rulings, approvals, interpretations, administrative practices and enforcement policies relied upon and conformed with *must be those of an agency* and not of an individual officer or employee of the agency." 29 C.F.R. § 790.19(b) (emphasis added; internal quotations omitted). The regulations further clarify that pronouncements from "an agency" refers to "the persons ... who actu-

ally have the power to act as (rather than merely for) the highest administrative authority for the Government establishment." *Id.* By contrast, "[s]tatements made by other officials or employees are not regulations, orders, rulings, approvals, interpretations, administrative practices or enforcement policies of the agency within the meaning of" the Portal–to–Portal Act. *Id.* § 790.19(c).

Here, the County seeks immunity on the basis of advice received from its private attorney, Gignilliat. Specifically, the County contends that after Gignilliat had conversations with some unknown representative of the Wage and Hour Division of the Department of Labor about whether *other counties*—not Lexington—should follow the "police officer" or "fire protection" overtime standard for its EMS employees, the "agency" gave Gignilliat firm policy guidelines that EMS employees in Lexington County were covered by § 7(k). Yet the County offered no evidence as to exactly with whom Gignilliat consulted, or for that matter, what was said.

In fact, Gignilliat's testimony at trial reflects that the District Director was the only official at the Wage and Hour Division with whom he spoke. The District Director, however, has no authority to speak as the "agency." *See Hodgson v. Square D Co.*, 459 F.2d 805, 809 (6th Cir.1972) (reliance on the statements of anyone other than the Administrator of the Wage and Hour Division of the Department of Labor, such as a regional director, do not satisfy the "agency" requirements of § 259). Because the County failed to prove that it relied on advice from the "agency," it cannot claim immunity under the Portal–to–Portal Act.

### III.

We next turn to EMS' contentions.

### A.

■ Initially, EMS argues that the district court erred in holding that the County

---

**4.** The Portal–to–Portal Act also subjects an employer who willfully violates the Fair Labor Standards Act to back pay awards for three, rather than two, years. 29 U.S.C.A. § 255 (West 1985).

The district court concluded that the County had not willfully violated the Fair Labor Standards Act and so was only liable for back pay for two years; EMS does not appeal that holding.

could exclude meal periods or sleep periods from its compensable time. Like the § 7(k) exemption, the burden rests with the County to demonstrate its entitlement to the mealtime and sleeptime exemptions, and we construe them narrowly. *See Johnson,* 949 F.2d at 130.

The County allocates to each EMS employee a total of two and one-half hours for meal time each day—7:00–7:30 a.m.; 1:00–2:00 p.m.; and 6:30–7:30 p.m.—and eight hours sleep time—11:00 P.M. to 7:00 a.m. If an employee is dispatched to an emergency during any portion of an hour of a meal or sleep period, he is compensated for the entire hour; however, if an employee is not required to respond to an emergency during his meal or sleep period, the County excludes those periods from the EMS worker's total number of compensable hours. The Act, of course, provides that an employer must pay employees overtime for "a workweek longer than forty hours." 29 U.S.C.A. § 207(a)(1). EMS' contention thus presents the question of whether its meal and sleep periods constitute "work" within this "workweek."

■■■ The Act does not define work. The Supreme Court, however, has concluded that "work" includes "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 598, 64 S.Ct. 698, 703, 88 L.Ed. 949 (1944). The Court has also held that work includes standby or waiting time. *See Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944) ("readiness to serve may be hired, quite as much as service itself"). The critical question, the Court has suggested, is "whether time is spent predominantly for the employer's benefit or for the employee's." *Id.* As the Sixth Circuit explained in *F.W. Stock & Sons, Inc.*

*v. Thompson,* 194 F.2d 493, 496 (6th Cir. 1952):

> *Time spent predominantly for the employer's benefit* during a period, although designated as a lunch period or under any other designation, nevertheless *constitutes working time* compensable under the provisions of the Fair Labor Standards Act.

*Id.* (emphasis added; internal quotations omitted). Against this background, we consider each exemption in turn.

1.

In 1956 the Secretary of Labor promulgated regulations addressing the mealtime exclusion, *see* 29 C.F.R. § 785.3(d) (1956), which remain unchanged today. The regulations provide that:

> [b]ona fide meal periods are not work time.... The employee must be completely relieved from duty for purposes of eating regular meals.... The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.

29 C.F.R. § 785.19(a) (1997). In issuing this regulation, the Secretary cited the Sixth Circuit's decision in *Stock* with its "predominantly for the employer's benefit" standard as illustrative of the regulatory "completely relieved from duty" requirement. Thus, although § 785.19(a) can be read to require that an employer may only exclude meal periods from compensation if it permits an employee to cease all duties of any kind during such periods, the Secretary did not seemingly intend such a broad construction.

■■■ After some preliminary debate as to the correct standard,[5] EMS recognizes precisely this. *See* Brief of Appellants at 18 ("Clearly the Secretary [of Labor] saw no conflict between the 'predominant benefit' " standard in *Stock* "and the Secretary's own 'completely relieved from duty' criterion.").

---

**5.** The employees initially suggest that in *Donovan v. Bel–Loc Diner, Inc.,* 780 F.2d 1113, 1115 n. 1 (4th Cir.1985), we "observed," and in *Johnson,* 949 F.2d at 129–30, we "reiterated" a standard more stringent than "predominant benefit"—that employees must be "completely relieved from duty" in order for a meal period to be excluded from hours worked. *See* Brief of Appellants at

14–15. In fact, neither *Donovan* nor *Johnson* focus on the correct standard, but rather they simply restate the regulatory language. To adopt such a broad interpretation of the regulation would virtually eliminate the entire exemption and would, of course, be contrary to *Armour* and *Stock.*

Thus, both the employees and the County maintain that a more recent Sixth Circuit case, *Hill v. United States,* 751 F.2d 810 (6th Cir.1985), which follows *Armour* and *Stock,* sets forth the analysis a court should apply in a situation like the one at hand. We agree. Like the *Hill* court, we believe the most appropriate standard for compensability is a "flexible and realistic" one where we determine whether, on balance, employees use mealtime for their own, or for their employer's benefit. *See Hill,* 751 F.2d at 814; *see also Reich v. Southern New England Telecommunications Corp.,* 121 F.3d 58, 64 (2d Cir.1997) (Section 785.19 "must be interpreted to require compensation for a meal break during which a worker performs activities predominantly for the benefit of the employer.").[6]

■■ This determination, the Supreme Court has counseled, is "a question of fact to be resolved by appropriate findings of the trial court." *Skidmore v. Swift,* 323 U.S. 134, 136–37, 65 S.Ct. 161, 162–63, 89 L.Ed. 124 (1944); *Reich,* 121 F.3d at 64 (inquiry is necessarily "fact-bound"). Here, the district court found the County proved entitlement to the mealtime exclusion because EMS employees

> had no official responsibilities during this period of time other than to respond to an emergency call if called upon. In fact, the policy of Lexington County was not to interrupt the lives of these employees during their mealtimes for any reason except for an emergency call.

*Roy,* 928 F.Supp. at 1417. The evidence at trial amply supports these findings. The written EMS personnel policy expressly provides that meal periods "must not be interrupted" except for emergencies. Moreover, the County also presented evidence that, although it required EMS employees to respond to emergencies within two minutes,

EMS employees could go anywhere within their 82 square-mile response zones during mealtime.

Nevertheless, EMS asserts that we must reverse because EMS employees "do exactly the same thing" during meal periods "as they do at all other moments during the shift." Brief of Appellants at 14. They rely on cases holding mealtime not excludable where the employees were required to spend their mealtime as they did the rest of the day— waiting to respond to emergency or other job related calls. *See Reich,* 121 F.3d at 65; *Kohlheim v. Glynn County,* 915 F.2d 1473, 1477 (11th Cir.1990); *Rotondo v. City of Georgetown,* 869 F.Supp. 369, 375 (D.S.C. 1994).

This reliance is misplaced. The employers in each of these cases imposed markedly greater restrictions on their employees' freedom during their mealtime. In *Kohlheim,* for example, firefighters were "required to remain at the station," "were subject to emergency calls," "significant affirmative responsibilities," and "real limitations on their freedom during mealtime which inure to the benefit of the county." *Kohlheim,* 915 F.2d at 1477. Similarly, in *Reich,* the defendant telephone company restricted its employees to eating at their work site for security purposes, and expected the employees to act as security guards while they ate. *Reich,* 121 F.3d at 65; *see also Rotondo,* 869 F.Supp. at 375 (mealtime not excluded from compensation where firefighters required to remain at fire station and answer telephone calls during mealtime).

■■ Although clearly "it is not necessary that an employee be permitted to leave the [employment] premises" for an employer to exclude his mealtime, 29 C.F.R. § 785.19(b) (1997), the example included in the regulation itself suggests that confinement to the worksite during mealtime is significant in deter-

---

**6.** Other circuits have also adopted the "predominant benefit" standard. *See Barefield v. Village of Winnetka,* 81 F.3d 704, 710 (7th Cir.1996); *Avery v. City of Talladega,* 24 F.3d 1337, 1345 (11th Cir.1994); *Henson v. Pulaski County Sheriff Dep't,* 6 F.3d 531, 534–35 (8th Cir.1993); *Lamon v. City of Shawnee,* 972 F.2d 1145, 1157 (10th Cir.1992). Some of these cases, however, involve the mealtime exemption under 29 C.F.R.

§ 553.223(b) (1997), which governs employees exempt under § 7(k), and arguably requires the employer to meet a less rigorous standard. *See Avery,* 24 F.3d at 1345; *Lamon,* 972 F.2d at 1157–58. *But see Barefield,* 81 F.3d at 710 n. 1 (although separate federal regulations govern § 7(a) and § 7(k) employees, the "predominant benefit test applies to both"). Accordingly, we do not rely on the cases construing § 553.223(b).

mining the compensability of mealtime. *Id.* § 785.19(a) ("an office employee who is *required to eat at his desk* or a factory worker who is *required to be at his machine* is working while eating" (emphasis added)). Here, EMS personnel were not only free to leave their worksite, they were permitted to travel anywhere in the 82 square-mile area surrounding it.

Finally, EMS contends that the "frequency with which meal periods are interrupted is always a crucial factor in these cases." Brief of Appellants at 19. This may be so, but here this factor works decidedly against EMS. Based on evidence EMS submitted, the district court clearly could find, as it did, that "the total number of interruptions" affected "certainly less than half of their meal periods." *Roy,* 928 F.Supp. at 1417. In fact, from our own review of EMS workers' timesheets in the record, during the sample period only 27% of the total number of meal periods occurring in 14 separate shifts were interrupted by emergency calls (221 of 860 meals interrupted). Accordingly, although we do not rule out the possibility that very frequent interruptions would operate "to impose a state of readiness ... as to warrant compensation during all meal periods," *Alexander v. City of Chicago,* 994 F.2d 333, 341 (7th Cir.1993) (Crabb, J. concurring), we cannot hold that, on this record, the district court clearly erred in refusing to so find.

### 2.

The regulations provide that when an employee is on duty for 24 hours or more, an employer may exclude from compensation a regularly scheduled sleep period of not more than eight hours, "provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep." 29 C.F.R. § 785.22(a) (1997). With respect to the employees' entitlement to "uninterrupted sleep," the regulation further provides that:

> [i]f the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted.

For enforcement purposes, the Divisions have adopted the rule that *if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.*

*Id.* § 785.22(b) (emphasis added).

EMS maintains that the district court improperly interpreted "uninterrupted sleep" in permitting the County generally to exclude the sleep period from compensable hours. (Of course, the County paid EMS personnel for a sleep hour whenever any portion of it was actually interrupted.) Specifically, EMS argues that in 60% of its shifts some portion of a sleep period was "interrupted" for some period of time, and for this reason EMS personnel did not "usually enjoy an uninterrupted night's sleep" as required under § 785.22(a) and so the County should not have been permitted to exclude the sleep period from compensable hours.

▪ Subsections (a) and (b) of 29 C.F.R. § 785.22, read together, define "uninterrupted" as meaning an employee cannot enjoy a "reasonable night's sleep" if he "cannot get at least 5 hours of sleep during the scheduled period." *Id.* § 785.22(a) & (b). *See also Bouchard v. Regional Governing Bd. of Region v. Mental Retardation Servs.,* 939 F.2d 1323, 1332 (8th Cir.1991) (defining "uninterrupted night's sleep" as "at least 5 hours sleep"). Accordingly, where employees can in fact enjoy at least five uninterrupted hours of sleep, the regulations can fairly be read to mean that such employees receive an "uninterrupted night's sleep," as required in § 785.22(a) for the employer to exempt such sleep time.

▪ Here the district court found that the majority of EMS personnel "enjoyed at least five hours of uninterrupted sleep without a call to duty." *Roy,* 928 F.Supp. at 1418. Evidence in the record clearly supports this finding. Indeed, in 13 sample shifts, only 35% of EMS sleep periods were interrupted to such an extent that EMS employees received less than five hours sleep. Given that 29 C.F.R. § 785.22(b) defines a "reasonable night's sleep" as one where an employee receives "at least five hours sleep" during the sleep period, the district court did

not clearly err, in finding the EMS personnel "usually" obtained an uninterrupted night's sleep for purposes of § 785.22(a), and so permitting the County generally to exclude the sleep period from compensable hours.

### B.

■ EMS next challenges the district court's determination that the County had properly computed EMS salaries based on a "fluctuating workweek system." *See Roy,* 948 F.Supp. at 530. The fluctuating workweek system permits an employer to pay employees a bi-weekly salary for all hours worked up to the statutory maximum. If an employee works more than the maximum number of hours during the pay period, his extra compensation is calculated by dividing the total number of hours worked into the bi-weekly salary to arrive at the employee's "hourly wage," then paying an additional amount, which is one-half that wage, for each hour worked in addition to the maximum regular hours worked.

■ The regulations permit the County to compensate the EMS employees pursuant to the fluctuating workweek system if the employer meets certain requirements. *See Flood v. New Hanover County,* 125 F.3d 249, 251–52 (4th Cir.1997). The only requirement at issue in this case is whether the County demonstrated "a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek." 29 C.F.R. § 778.114 (1997). Although the County must demonstrate that a "clear mutual understanding" exists between it and the EMS employees, it need *not* prove that an employee "also understand[s] the manner in which his or her overtime pay is calculated." *Bailey,* 94 F.3d at 155. Rather, "if it is clear from the employee's actions that he or she understood the payment plan in spite of after-the-fact verbal contentions otherwise," the County has sufficiently demonstrated a "clear mutual understanding." *Mayhew v. Wells,* 125 F.3d 216, 219 (4th Cir.1997).

In *Mayhew,* our most recent discussion of the fluctuating workweek, we upheld its application where the employee possessed only a basic understanding of his compensation plan; "he knew he would never be paid more than his fixed salary no matter how many hours he worked, nor would he be docked if he worked fewer than the expected 160 hours per work period." *Id.* We noted that "[a]lthough the evidence [was] equivocal as to whether[the employee] fully understood [his compensation] arrangement, such an understanding is not necessary." *Id.* at 220.

In light of *Bailey* and *Mayhew,* we must affirm the district court's holding that the County proved a "clear and mutual understanding" existed between it and EMS about the fluctuating workweek method. First, the County produced evidence that EMS employees knew that they were paid a salary rather than an hourly wage. EMS Coordinator Tom Gross testified that since at least 1990, he interviewed every employee and told each one that he would be paid the salary at which the job was advertised, and that on occasion he might get a "little more." Similarly, the personnel forms given to EMS employees express compensation as "salaried," and note that employees are paid in bi-weekly installments; no hourly rate is shown.

The County also demonstrated that it apprised EMS personnel of the fluctuating overtime compensation plan. The employee handbook, published after 1985, explicitly states:

> EMS [employees] ... are paid a fixed salary for all hours worked in the pay period. Overtime for non-exempt employees is computed at 1/2 the hourly rate for the pay period when the number of hours worked exceeds the maximum hour standards for the work period (14 days).

Mr. Gross testified that on at least one occasion a County personnel director discussed with EMS in-service trainees the nature of the pay plan. Moreover, on June 28, 1985, the County Director of Public Safety distributed a memorandum to all EMS and fire department personnel informing them that "a fluctuating pay plan will be used to compute overtime pay." One plaintiff even admitted that she knew that she was paid at "half-time overtime" and another calculated his overtime. Thus, the County offered ample evidence to support the district court's

finding that EMS employees knew that they were salaried with opportunities to earn overtime at a half-time rate for any hours worked in excess of their regular shifts.[7]

## C.

Finally, we turn to EMS' challenges to the district court's determination as to damages.

### 1.

■ EMS maintains that the district court erred in concluding that the County need not pay liquidated damages. The Act provides that any employer who violates § 6 or § 7 of the Act "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation ... and in an *additional equal amount as liquidated damages.*" 29 U.S.C.A. § 216(b) (West 1965 & Supp.1997) (emphasis added). EMS contends that because the County failed to comply with § 7(a) of the Act, by instead improperly paying the employees pursuant to § 7(k), the County should be required to pay liquidated damages.

■ Liquidated damages "are considered compensatory rather than punitive in nature," *Reich,* 121 F.3d at 71 (citing *Brooklyn Sav. Bank v. O'Neill,* 324 U.S. 697, 707, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945)), and constitute "compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." *Id.* (quoting *Brooklyn Sav. Bank,* 324 U.S. at 707, 65 S.Ct. at 902). In its sound discretion, however, a court may refuse to award liquidated damages if:

> the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believ-

ing that his act or omission was not a violation of the Fair Labor Standards Act. 29 U.S.C.A. § 260 (West 1985); *see also Lyle v. Food Lion, Inc.,* 954 F.2d 984, 987 (4th Cir.1992).

Here, the district court was satisfied as to the County's good faith and reasonableness, and the record supports this conclusion. First, the district court found, and EMS does not dispute, that the County's conduct was not willful for purposes of the statute of limitations issue. *See Roy,* 928 F.Supp. at 1422; *see also supra* n. 4. We credit this finding as evidence of the County's good faith. *See Mayhew,* 125 F.3d at 221 n. 4. Second, the County produced evidence that it relied consistently on the advice of Gignilliat, its labor counsel, which indicates the County's good faith, even though the advice ultimately proved incorrect. *See Lee v. Coahoma County,* 937 F.2d 220, 227 (5th Cir.1991). Third, the district court could reasonably find that, because the County compensated EMS employees more generously in certain instances than the Act required, the County acted in good faith. Finally, as the district court noted, the County demonstrated reasonableness and good faith in putting forward well-reasoned, sound legal arguments justifying its payment plan as to all of the liability issues.

■ Nevertheless, EMS asserts that the district court abused its discretion in denying liquidated damages. EMS contends that the County's failure to attempt to secure an opinion letter from the Wage and Hour Division regarding the applicability of § 7(k), in light of longstanding case law to the contrary, indicates bad faith and objective unreasonableness. We disagree. Although an employer "may not simply remain blissfully ignorant of FLSA requirements," it need not seek an opinion letter to avoid paying liqui-

---

7. EMS employees can point to nothing that demonstrates that they *lacked* this basic knowledge. At most, EMS has identified potential confusion reflected in a 1985 memorandum issued when the fluctuating workweek plan took effect, stating that the employees would be paid at "1 and 1/2" times their regular hour for overtime, not "1/2 times." The County eliminated any confusion in another memorandum and the employee handbook discussed above. Moreover, the County's failure to state on every EMS personnel action form that each employee is "salaried for all hours worked" is inconsequential in light of the evidence showing that EMS employees knew they were salaried. Similarly, EMS' pay stubs, which indicate that the employees are paid "regular earnings" for all hours up to the maximum worked, are not, on this record, in any way misleading.

dated damages later. *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir.1984). Rather, the County's consultation with counsel and ongoing modification of its compensation structure to accommodate changes in the Act provides adequate proof that it did not take an "ostrichlike" approach to the Act, even though the County's interpretation ultimately has been rejected. *Id.*

Nor, contrary to EMS' suggestion, did the County exhibit bad faith in failing to explain its fluctuating workweek method of payment. The County has no obligation to ensure that EMS employees understand the precise manner in which their compensation is calculated. *Mayhew*, 125 F.3d at 220; *Bailey*, 94 F.3d at 155. Thus, the County's failure to explain the precise workings of the fluctuating workweek system does not undermine the district court's finding of good faith and reasonableness.

EMS' final argument on this point is that the County's failure to compensate EMS employees for missed meal periods during "standby" shifts demonstrates bad faith. The County, however, points out that EMS' own employees repeatedly overlooked the same omission. In fact, both parties discovered the omission for the first time at trial. Without any additional evidence that the County's actions were purposeful or intentionally designed to circumvent the Act, we will not upset the district court's findings because of this seemingly innocent error. Accordingly, we affirm the district court's denial of liquidated damages.

### 2.

EMS also argues that the district court erred in apportioning the special master's fees equally between it and the County. Section 16(b) of the Act provides:

> The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee *to be paid by the defendant,* and *costs of the action.*

29 U.S.C.A. § 216(b) (West Supp.1997) (emphasis added). The Act does not define "costs." EMS maintains, however, that "costs" include a special master's fees. We need not reach that question here, however, because even if a special master's fees are "costs" under § 216(b), EMS has not demonstrated that the district court abused its discretion in apportioning such fees.

Rule 53(a) of the Federal Rules of Civil Procedure vests the district court with authority to allocate the special master's fees. Fed. R. Civ. Pro. 53(a) ("[t]he compensation to be allowed to a master shall be fixed by the court, and shall be charged upon such of the parties ... *as the court may direct*" (emphasis added)). Although courts have construed a special master's fees as "costs" under the Federal Rules of Civil Procedure, *see, e.g., Aird v. Ford Motor Co.*, 86 F.3d 216, 221 (D.C.Cir.1996) (collecting cases), the apportionment of a special master's fees has always remained squarely within the trial court's discretion. *Id.* (collecting cases).

Moreover, we have held that apportionment of other fees under § 216(b) of the Act, namely, a "reasonable attorney's fee," also "is within the sound discretion of the trial court," *Burnley*, 730 F.2d at 141, and so recognize that the district court retains that same discretion in assessing "costs" under § 216(b). Because EMS has failed to demonstrate that the district court abused its discretion in ordering each side to pay one-half of the special master's fees, we affirm the district court's apportionment of the fees.

### IV.

For the foregoing reasons, the judgment of the district court is, in all respects,

*AFFIRMED.*