**Luis A. PEREZ, et al., Plaintiffs**

v.

**MOUNTAIRE FARMS, INC., et al., Defendants.**

**Civ. No. AMD 06–121.**

United States District Court, D. Maryland.

April 17, 2009.

---

C. Christopher Brown, Jane Reisen Flanagan, Deborah Thompson Eisenberg, Brown Goldstein and Levy LLP, Baltimore, MD, for Plaintiffs.

Arthur M. Brewer, Eric Hemmendinger, Shawe And Rosenthal LLP, Baltimore, MD, James Lester Hughes, James Larry Stine, Michael Joel Sloan, Wimberly Lawson Steckel Weathersby and Schneider, Paul Oliver, Wimberly Lawson Steckel Schneider and Stine P.C., Atlanta, GA, for Defendants.

## MEMORANDUM OPINION SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO FED. R. CIV. P. 52

ANDRE M. DAVIS, District Judge.

In this action arising under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., as amended by the Portal–to–Portal Act, 61 Stat. 86–87, and Delaware state law, the plaintiff class, current and former employees of Defendants Mountaire Farms, Inc., and Mountaire Farms of Delaware, Inc., seek compensation for the time required to don and doff personal protective equipment ("PPE"). In particular, Plaintiffs assert that the time spent on (1) donning the PPE at the beginning of the shift, (2) doffing certain pieces of the PPE at the beginning of the lunch period, (3) re-donning the doffed PPE at the end of the lunch period and (4) doffing the PPE at the end of the shift are compensable. Plaintiffs further assert that, under the continuous work day rule, time spent walking, sanitizing the PPE, and waiting for the principal work to commence are compensable.

Defendants present several defenses. First, Defendants argue that (1) such donning and doffing is uncompensable as a matter of law and (2) lunch breaks are uncompensable per se because they primarily benefit the employee. Defendants then argue that, even if such donning and doffing is compensable under the FLSA, Plaintiffs are nevertheless precluded from recovery because the time spent on donning and doffing is de minimis. Moreover, Defendants argue that the time spent on donning and doffing items for which they have the option of taking home are properly excluded from compensable time.

I conducted a bench trial over one week, from Monday, March 23, 2009, to Friday, March 27, 2009. After careful consider-

ation of the witness testimony, trial exhibits, and all the evidence presented, and after considering the arguments of counsel, I find that the Plaintiffs have established Defendants' liability. There follows my findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT

### Donning and Doffing Activities at the Millsboro, Delaware Plant

1. Defendants are Delaware corporations operating a Millsboro, Delaware, plant that slaughters, processes, and distributes chickens. *Def's Stmt of Facts 1; Aristazabal Decl. ¶ 2; Pl's Ex. 8.*

2. The Millsboro plant is divided into the following departments (also called lines): Receiving, Pinning, Evisceration, Rehang, Giblets, Packing, Cut-up, Cone Debone, Tray Pack, Marination, WPL, Dry Cooler, MSC, PAWS, Sam's Club, Leg Debone, Thigh Debone, and Shipping. *Def's Stmt of Facts 2; Aristazabal Decl. ¶ 3; Pl's Ex. 8.*

3. The Millsboro plant produces 1.5 million chickens per week. *Pl's Ex. 20(c).*

4. Defendants' employees are paid based on "line time," which begins when the first chicken arrives at the first individual work station of each department and ends when the last chicken leaves the last individual work station of each department. *Id.*

5. Although employees are paid based on "line time," they are nevertheless required to "clock in" each day that they arrive for work. *Def's Stmt of Facts 8; Aristazabal Decl. ¶ 9.*

6. Supervisors use the "clock in" time to prepare a report detailing actual time worked when an employee is late

for work (i.e., not present at his work station at the beginning of line time). *Id.*

7. Employees are required to wear PPE in order to comply with United States Department of Agriculture ("USDA") sanitary requirements and Occupational Safety and Health Administration ("OSHA") safety regulations. *Def's Stmt of Facts 3; Aristazabal Decl. ¶ 4; Pl's Ex. 8.*

8. All employees are required to wear ear plugs, bump caps, smocks (also called lab coats), hair/beard nets, and steel toed rubber boots. *Def's Stmt of Facts 3; Aristazabal Decl. ¶ 4; Pl's Ex. 6.*

9. Employees are required to wear a combination of other PPE (such as nitrile/latex/rubber gloves, aprons, safety glasses, mesh cut resistant gloves, chain gloves and sleeves) based on the requirements of the department in which they work. *Def's Stmt of Facts 3; Aristazabal Decl. ¶ 4; Pl's Ex. 6.*

10. Only the employees who work with knives or scissors (Evisceration and Debone Departments) wear cut-resistant gloves. *Luisa Perez Testimony, 3/23/09; Pl's Ex. 6.*

11. Employees wear bump caps in order to prevent an employee's hair from falling into the product. *Pl's Ex. 26(a); Zlotorzynski Dep 17:12–15.*

12. The bump caps are not of a grade or quality of a helmet that would prevent head injuries when worn. *Pl's Ex. 26(c); Zlotorzynski Dep 17:6–11, 17:19–18:2, Def's Ex. 13.*

13. Employees wear ear plugs to protect their ears from loud noise in the production floor. *Pl's Ex. 26(d); Zlotorzynski Dep 28:10–17.*

14. Different ear plugs have different OSHA ratings and employees are re-

quired to wear specific ear plugs depending on which section of the plant they work and how noisy that section is. *Pl's Ex. 26(d); Zlotorzynski Dep 28:10–17.*

15. Employees don and doff their PPE at various locations: by their lockers, in the bathrooms, in the production area, or in the hallways as they walk to their workstations. *Def's Stmt of Facts 3; Aristazabal Decl. ¶ 4; Pl's Ex. 18.*

16. The normal sequence of donning is as follows: smocks, followed by hair nets, bump caps, ear plugs, cut-resistant sleeves, apron, and safety glasses. *Luisa Perez Testimony, 3/23/09; Pl's Ex. 18.*

17. Before entering their department's production area, employees must wash their hands and/or sanitize their PPE by walking through a foot bath, dipping their gloves into a sanitizing solution, and splashing sanitizing solution on their aprons. *Def's Stmt of Facts 4; Aristazabal Decl. ¶ 5; Pl's Ex. 18; Def's Ex. 3, Def's Ex. 13.*

18. Employees are prohibited from taking their aprons, gloves, sleeves, and smocks into the restrooms for sanitary reasons. *Pl's Ex. 26(j); Zlotorzynski Dep 61:7–18, Def's Ex. 11.*

19. There are coat racks at the entrance of the restrooms so that employees may hang their PPE before entering. *Def's Ex. 13.*

20. Employees must replace soiled or unsanitary smocks before entering the production floor. *Def's Ex. 4.*

21. The Millsboro plant launders and provides clean smocks to employees. *Barrientos Testimony, 3/23/09; Luisa Perez Testimony, 3/23/09; Pl's Ex. 18; Pl's Ex. 26(c).*

22. Employees usually obtain clean smocks from the company each day.

*Barrientos Testimony, 3/23/09; Luisa Perez Testimony, 3/23/09; Pl's Ex. 18; Pl's Ex. 26(c); Zlotorzynski Dep 25:17–22.*

23. Clean smocks are placed on racks in the hallways. *Barrientos Testimony, 3/23/09; Luisa Perez Testimony, 3/23/09; Pl's Ex. 4(d); Pl's Ex. 18.*

24. Employees usually deposit their soiled smocks in hampers located in the hallways. *Barrientos Testimony, 3/23/09; Luisa Perez Testimony, 3/23/09; Pl's Ex. 4(d); Pl's Ex. 18.*

25. Employees may obtain clean PPE items from the supply room. *Pl's Ex. 18.*

26. Employees are required to clean their bump caps daily with soapy water. *Pl's Ex. 26(a); Zlotorzynski Dep 18:3–8; Def's Ex. 13.*

27. Although not required, almost all employees sanitize their aprons, boots, and gloves before leaving the production area for their lunch break so that they may eat without blood and other chicken products on their persons. *Barrientos Testimony, 3/23/09; Luisa Perez Testimony, 3/23/09; Pl's Ex. 18.*

28. Employees usually doff their aprons and gloves during the lunch break, placing their aprons on hooks in the hallways. *Pl's Ex. 18.*

29. Employees usually store all of their PPE (excluding the soiled smocks) in their lockers at the end of each day. *Barrientos Testimony, 3/23/09; Luisa Perez Testimony, 3/23/09; Pl's Ex. 18.*

30. Every employee who requests a locker is provided with one. *Pl's Ex. 26(c); Zlotorzynski Dep 85:5–13.*

31. Employees may not share lockers. *Def's Ex. 11.*

32. Employees are prohibited from keeping any food or drink in their lockers. *Def's Ex. 5; Def's Ex. 11.*

33. On Fridays, employees must take home all of the PPE stored in their lockers because the locker rooms are thoroughly cleaned on weekends. *Barrientos Testimony, 3/23/09; Perez Testimony, 3/23/09; Zlotorynski Depo 25:12–16; Def's Ex. 11.*

34. Many employees keep their gloves and goggles in their smock pockets during lunch breaks. *Shitwa Perez Testimony, 3/23/09.*

35. Prior to July 17, 2006, employees were prohibited from taking smocks home. *Def's Ex. 1.*

36. On July 17, 2006, Defendants changed their policy to allow employees to take their smocks home. *Def's Ex. 1* ("Employees have the option to take home smocks, as well as hair nets, ear plugs, bump caps, gloves, boots, and aprons. Employees may change into and/or out of these items at home. The smock should be kept clean and may be changed during the course of the day as often as necessary.").

37. Employees were asked to sign forms indicating that they have read and understand the July 17th policy that allowed them to take smocks home. Def's Ex. 1.

38. Many employees were not aware of the smock take home change in policy. *Barrientos Testimony, 3/23/09; Perez Testimony, 3/23/09.*

39. Those employees who were aware of the smock take home policy thought it was "impractical." *Barrientos Testimony, 3/23/09; Zlotorzynski Dep 25:12–16.*

40. Even after the smock take home policy was instituted, many employees still refrained from taking smocks home. *Barrientos Testimony, 3/23/09; Luisa Perez Testimony, 3/23/09; Pl's Ex. 18; Pl's Ex. 4(f);*

*Davis Depo 77:18–78:1* ("Because those smocks are dispensed to employees and then collected in the sense that they throw them in a bin on the way out and then they're replenished pretty much every day so I am not—and then they're—then they're laundered at the employer[sic] expense so I was not aware specifically that I could recall right now of anybody even taking a smock out of the building. . . ."); *Pl's Ex. 15.*

41. Everyone entering the production floor (e.g., employees, supervisors, visitors) is required to wear smocks, aprons, boots, gloves, hair nets, bump caps, and ear plugs. *Irwin Testimony 3/26/09.*

42. At the beginning of the shifts, end of the shifts, and during lunch breaks, hallways are crowded and congested with foot traffic. *Pl's Ex. 18.*

43. Employees may be disciplined or fired for failing to comply with any company regulation, including the donning and sanitizing of PPE. *Def's Ex. 13.*

### Breaks

44. Employees are given 36 minutes of unpaid lunch breaks. *Def's Ex. 13.*

45. Employees are given 10 minutes of paid break time before lunch. *Def's Ex. 13.*

46. Employees are given 10 minutes of paid break time after lunch only if the department in which they are working require more than 8 hours and 15 minutes in the shift. *Def's Ex. 13.*

47. Employees are required to use a portion of their 36 minutes of unpaid lunch break to doff PPE after exiting the production floor. *Irwin Testimony, 2/25/09.*

48. Employees are required to use a portion of their 36 minutes of unpaid lunch break to don PPE before entering the production floor. *Irwin Testimony, 2/25/09.*

### Plaintiffs' Expert Testimony re Donning and Doffing Time

49. Plaintiff's expert, Dr. Robert Radwin, made an initial trip to the Mountaire Millsboro plant on January 8, 2008, to observe employee donning and doffing practices and to refine his experimental procedures based on these practices. *Pl's Ex. 17.*

50. Dr. Radwin conducted his study at the Millsboro plant between March 18, 2008, and March 20, 2008. *Pl's Ex. 17.*

51. Dr. Radwin's approach in calculating the total donning and doffing time was to videotape randomly selected employees donning and doffing PPE under actual working conditions during normal work activities. *Pl's Ex. 17.*

52. Dr. Radwin found that donning and doffing activities typically occurred prior to, or immediately following a scheduled shift or break. *Pl's Ex. 17.*

53. Dr. Radwin employed four synchronized videographers who were stationed at various locations around the Millsboro plant. *Pl's Ex. 17.*

54. At the beginning of the shifts, videographers were stationed near the doors where employees typically arrived and passed before donning and doffing PPE. *Pl's Ex. 17.*

55. When lunch breaks were scheduled to begin, videographers were stationed on the production floor where employees worked. *Pl's Ex. 17.*

56. At the end of lunch breaks, videographers were stationed on production floors and hallway locations where employees typically sanitized equipment before heading to their workstations. *Pl's Ex. 17.*

57. The videographers simultaneously videoed different employees selected using a random number generator that ranged from one to six; for example, if the random number generator selected the number three, then each of the videographers would (1) pick out the third person to enter the entrance at which the videographer was stationed and (2) videotape the person as the person performed donning and doffing activities. *Pl's Ex. 17.*

58. Dr. Radwin's study also used the random number generator to pick employees to record during lunch breaks; for example, if the random number generator selected the number three, then each of the videographers would (1) pick out the third person on the production line at which the videographer was stationed and (2) videotape the person as the person performed donning and doffing activities. *Pl's Ex. 17.*

59. Videotapes were made during the various times of day and night when each shift performed donning and doffing activities and at the different locations throughout the plant where donning and doffing activities were scheduled to take place. *Pl's Ex. 17.*

60. Dr. Radwin included in his study employees working in all shifts. *Pl's Ex. 17.*

61. Donning and doffing activities at the start of the shift were recorded in the locker rooms, hallways, plant floors or other locations in which employees acquired, donned, sanitized, and stowed PPE. *Pl's Ex. 17.*

62. Donning and doffing activities at the start and end of lunch breaks were recorded on the production floors, hallways, and other locations in which donning and doffing, sanitizing, and walking occurred. *Pl's Ex. 17.*

63. Donning and doffing activities at the end of the shift were recorded at the employees' individual work stations, hallways, locker rooms, and other locations in which employees sanitized, doffed, and stowed PPE. *Pl's Ex. 17.*

64. Neither Dr. Radwin nor any of the videographers had any contact with the employees prior to the times in which the employees were actually videotaped. *Pl's Ex. 17.*

65. Videographers were instructed to refrain from (1) approaching employees while the line was active (i.e., chicken was being processed on the line) or (2) engaging in conversation with any of the employees. *Pl's Ex. 17.*

66. Plant supervisors were informed ahead of time that videographers would be present at the plant. *Pl's Ex. 17.*

67. Employees who later objected to being videotaped were not included in the study. *Pl's Ex. 17.*

68. Only a few, if any, employees objected to being videotaped and therefore excluded from the study. *Radwin Testimony, 3/25/09.*

69. Dr. Radwin determined recording times from video frame time codes, which were linked to each video frame and recorded directly onto videotapes. *Pl's Ex. 17.*

70. Dr. Radwin analyzed the recorded videos using a special work measurement software that his laboratory at the University of Wisconsin–Madison developed under the trademark Multimedia Video Task Analysis ("MVTA"). *Pl's Ex. 17.*

71. Dr. Radwin analyzed the video on a frame by frame basis. *Pl's Ex. 17.*

72. Conventional video, which Dr. Radwin used, records thirty (30) frames of video per second, thereby giving 0.00056–minute (1/30 second) precision. *Pl's Ex. 17.*

73. The MVTA allowed Dr. Radwin to scroll through the video (i.e., freeze, advance, reverse) in order to identify the precise frame, and thus, time period, in which the beginning or end of the donning and doffing activities occurred. *Pl's Ex. 17.*

74. Donning at the beginning of the shift, as defined by Dr. Radwin's study, began when the employee being recorded first acquired a piece of PPE. *Pl's Ex. 17.*

75. Donning at the beginning of the shift concluded when the employee being recorded reached his workstation on the production line and became ready for work. *Pl's Ex. 17.*

76. Doffing at the start of the lunch break began when the employee being recorded departed his workstation. *Pl's Ex. 17.*

77. Doffing at the start of the lunch break concluded when the employee being recorded released the last PPE. Pl's Ex. 17.

78. Re-donning at the end of the lunch break began when the employee being recorded obtained PPE. *Pl's Ex. 17.*

79. Re-donning at the end of the lunch break concluded when the employee being recorded reached his workstation on the production line and became ready for work. *Pl's Ex. 17.*

80. Doffing at the end of the shift began when the employee being record-

ed departed his workstation. *Pl's Ex. 17.*

81. Doffing at the end of the shift concluded when the employee being recorded released the last PPE. *Pl's Ex. 17.*

82. For donning activities, Dr. Radwin's study included time spent on all activities (e.g., walking, sanitizing, waiting in line) occurring between the employee's obtaining the first piece of PPE and the employee's arrival at his work station. *Pl's Ex. 17.*

83. For doffing activities, Dr. Radwin's study included time spent on all activities (e.g., walking, sanitizing, waiting in line) occurring between the employee's departure from the production line to the employee's release of the last piece of PPE. *Pl's Ex. 17.*

84. To summarize:

Table 2. Elements of Donning and Doffing Activities at the Mountaire Millsboro Plant

| Activity | Initiating Event | Terminating Event |
|---|---|---|
| 1. Don at Start of Shift | Employee first acquires personal protective or sanitary equipment item at the start of shift. | Employee enters the plant floor, has completed donning, and is ready to work. |
| 2. Doff Start of Lunch Break | Employee departs workstation and starts doffing at start of break. | Employee doffing last personal protective equipment item before going to lunch. |
| 3. Don End of Lunch Break | Employee starts to don first personal protective or sanitary equipment item at end of break. | Employee arrives at workstation and has completed donning and sanitizing personal protective and is ready to work. |
| 4. Doff at End of Shift | Employee departs workstation and starts doffing at end of shift. | Employee departs area where doffing occurs and completes doffing and sanitizing personal protective equipment. |

*Pl's Ex. 17.*

85. Dr. Radwin's study excluded time that employees spend (1) in the bathroom, (2) in the cafeteria, and (3) waiting at a workstation for the production line to begin. *Pl's Ex. 17.*

86. Using the MVTA, Dr. Radwin computed the elapsed time for each donning and doffing activity. *Pl's Ex. 17.*

87. Dr. Radwin's study included 197 employees, which represents 14% of the employee payroll population on March 13, 2008. *Pl's Ex. 17.*

88. The difference between the proportion of employees on the actual payroll and employees sampled was 3% or less for the following departments: 2nd Processing, Further Processing, Production Support, and Delaware Support. Pl's Ex. 17.

89. The department in which the difference between the proportion of employees on the actual payroll and employees sampled was the greatest (12%) was Debone. *Pl's Ex. 17.*

90. The department in which the difference between the proportion of employees on the actual payroll and employees sampled was the second greatest (11%) was First Processing. *Pl's Ex. 17.*

91. There were no statistical differences between the mean elapsed time for either the Debone or First Pro-

cessing departments and any other element of the study so the differences in proportions were statistically insignificant. *Pl's Ex. 17.*

92. The mean donning time at the start of the shift was 8.570 minutes. *Pl's Ex. 17.*

93. The mean doffing time at the start of the lunch break was 2.571 minutes. *Pl's Ex. 17.*

94. The mean re-donning time at the end of the lunch break was 4.225 minutes. *Pl's Ex. 17.*

95. The mean doffing time at the end of the shift was 5.512 minutes. *Pl's Ex. 17.*

96. Using a 95% confidence interval and mean donning and doffing time of 20.879 minutes, Dr. Radwin concluded that the total time for all donning and doffing activities at the Millsboro plant was 20.013 minutes. *Pl's Ex. 17.*

**Defendants' Expert Testimony re Donning and Doffing Time**

97. Defendants' expert, Dr. Jerry Davis, conducted two studies: one on donning and doffing time and the other on walking time. *Def's Ex. 31.*

98. Dr. Davis conducted these studies at Mountaire Millsboro plant at two different weeks in March 2008. *Davis Testimony, 3/26/09.*

99. Dr. Davis' donning and doffing study had 198 employee-participants. *Def's Ex. 31.*

100. The employees who participated in Dr. Davis' study were selected and recruited by company supervisors/managers. *Def's Ex. 31.*

101. Dr. Davis claims that company supervisors/managers randomly selected employees for the donning and doffing study, although he did not know what methodology they used. *Davis Testimony, 3/26/09.*

102. Dr. Davis' report does not indicate the methodology or criteria used by the company supervisors/managers to select the participating employees. *Def's Ex. 31.*

103. I find that the employees were not selected on a random basis.

104. Participants left their normal assignments, washed up, and reported to a conference room where Dr. Davis waited. *Def's Ex. 31.*

105. Upon arrival at the conference room, Dr. Davis (1) explained that he was conducting a study on donning and doffing, (2) told participants that they were required to don and doff PPE while being timed, and (3) procured demographic information (i.e., name, job title, length of employment) from the participants. *Def's Ex. 31.*

106. Because a number of the participants were Spanish-speaking and possessed only a rudimentary grasp of English, Dr. Davis employed an interpreter to ensure that the participants understood the methods for and requirement of the donning and doffing study. *Def's Ex. 31, Davis Testimony, 3/26/09.*

107. Humberto Aristazabal, a Human Resources manager at the Millsboro plant, acted as Dr. Davis' translator. *Davis Testimony, 3/26/09.*

108. Participants were required to remove all of the PPE that they were wearing when they entered the conference room. *Def's Ex. 31.*

109. PPE items, provided by the company, were laid out on the conference room table to serve as a control for the study. *Def's Ex. 31.*

110. Dr. Davis' study did not include the donning and doffing of boots. *Davis Testimony, 3/26/09.*

111. Participants were asked to (1) pick up from the conference room ta-

ble the PPE items that they were normally required to wear, (2) don the PPE items in the normal order in which they donned every work day, (3) doff the PPE items in the normal order in which they doffed after work every day, and (4) place the PPE items back on the conference room table where they had initially retrieved them. *Def's Ex. 31.*

112. Dr. Davis used a handheld stopwatch to time the participants donning and doffing the PPE items. *Def's Ex. 31.*

113. Dr. Davis timed the donning/doffing of each particular PPE item (e.g., number of seconds required to put on a smock). *Def's Ex. 31.*

114. Dr. Davis timed the whole donning and doffing process without pause. *Def's Ex. 31.*

115. Dr. Davis timed 1448 donning and doffing activities, including the donning and doffing of each particular PPE item and the whole donning and doffing process. *Def's Ex. 31.*

116. Dr. Davis video recorded the trials. *Def's Ex. 31.*

117. Participants were carefully instructed that, although they were being timed, the study was not a "race" and that they should proceed in their normal donning and doffing order and speed. *Def's Ex. 31.*

118. When Dr. Davis felt that a trial should be invalidated for any number of reasons, he stopped the trial, explained the deficiency and repeated the trial prior to recording observed times. *Def's Ex. 31.*

119. Dr. Davis entered all of the data collected from the study into an Excel spreadsheet, verifying the accuracy of his input afterwards. *Def's Ex. 31.*

120. Dr. Davis entered in the spreadsheet the following information: assigned participant number, date, number of items used for donning, donning time (in seconds), and the number of items used for doffing, and doffing time. *Def's Ex. 31.*

121. Dr. Davis' actual observed mean donning time was 88.9 seconds. *Def's Ex. 31.*

122. Dr. Davis' actual observed mean doffing time was 36.6 seconds. *Def's Ex. 31.*

123. Dr. Davis performed a statistical test on the data in order to determine any potential outliers. *Def's Ex. 31.*

124. Of the 1448 times measured during the study, 57 or 3.9% were deemed to be outliers and excluded from the filtered data set. *Def's Ex. 31.*

125. All of the 57 excluded outliers were on the high side, meaning that the donning and doffing times measured were higher than the averages. *Def's Ex. 31.*

126. Dr. Davis' model reports that the average employee spends 3.3 minutes per shift donning and doffing the required PPE. *Def's Ex. 31.*

127. In addition to timing the donning and doffing process, Dr. Davis also asked participants to self-report what they believed to be their donning and doffing times during the trials. *Def's Ex. 31.*

128. In reporting their perceived donning time, 20% of the total participants underestimated the time for their actual trial, 15% correctly estimated, and 65% overestimated. *Def's Ex. 31.*

129. In reporting their perceived doffing time, 0% of the total participants underestimated the time for their actual trial, 5% correctly estimated, and 95% overestimated.

130. Dr. Davis' donning and doffing study did not include any member of the opt-in plaintiff class. *Def's Ex. 31.*

131. Dr. Davis' walking study did not include any employee participants. *Def's Ex. 31.*

132. Dr. Davis' walking study used the "normal performance" or benchmark for walking, which is described as walking 100 feet on a flat, level surface accomplished in 0.38 minutes. *Def's Ex. 31.*

133. Dr. Davis' used the benchmark for walking and applied it to his study in terms of average walking speed for males and females—approximately 3.0 miles per hour. *Def's Ex. 31.*

134. Dr. Davis met with plant managers to create a layout of the plant. *Def's Ex. 31.*

135. With the help of plant managers, Dr. Davis marked the layouts to indicate where each employee, or closely located groups of employees, walked around on a typical work day. *Def's Ex. 31; See Def's Ex. 35.*

136. Based on the marked layouts, Dr. Davis measured the distances employees typically walk using a calibrated device from the closest plant door (which is used to gain access to the locker room) to the individual work stations on the production floor. *Def's Ex. 31; See Def's Ex. 35.*

137. Where multiple locations could be chosen for general area measurements, Dr. Davis picked the center of a room (e.g., locker room) as the starting/ending point for the measurement. *Def's Ex. 31; See Def's Ex. 35.*

138. Dr. Davis used the average walking speed and measured distances to create a model that allowed him to calculate the average walking time per shift. *Def's Ex. 31.*

139. Dr. Davis' model takes into account wet and dry conditions. *Def's Ex. 31.*

140. Dr. Davis' model took into account various impediments, such as steps and doors (swinging doors with no knobs). *Def's Ex. 31.*

141. Dr. Davis' study did not account for crowded hallway conditions, which were prevalent at the plant, especially during the beginning and end of shifts. *Davis Testimony, 3/26/09.*

142. Dr. Davis' model predicted the walking time for each department:

| Department | Walking Time/Shift (mins) |
| --- | --- |
| Receiving | 8.9 |
| Pinning | 9.8 |
| Evisceration | 9.1 |
| Rehang | 6.9 |
| Giblet | 3.7 |
| Cut–Up | 6.0 |
| Cone Debone | 6.1 |
| Jumbo Party Wings | 5.7 |
| Tray Pack | 7.4 |
| Marination | 7.6 |
| MSC | 10.3 |
| Paws | 10.3 |
| DSI | 7.2 |
| Sam's Club | 8.2 |
| Roasters | 7.2 |
| WPL | 7.9 |
| Dry Cooler | 9.8 |
| Leg Debone | 5.0 |
| Thigh Debone | 5.4 |
| Wet Cooler | 4.6 |
| Mean Walking Time | 6.75 |
| Surface Factor (1%) | 0.07 |
| Boot Factor (1%) | 0.07 |
| | 6.9 mins/shift |

*Def's Ex. 31.*

143. Dr. Davis' model concluded that the total walking time is 6.9 minutes. *Def's Ex. 31.*

144. Dr. Davis conducted actual timed trials in order to validate the model output. *Def's Ex. 31.*

145. Dr. Davis performed time trials of walking the routes to/from the works-

tation and assigned plant door, near the donning and doffing area. *Def's Ex. 31.*

146. Dr. Davis' model overestimated the walking time measured by his timed trials by 13.8%.

147. Dr. Davis' study concluded that the total donning and doffing and walking time was 10.2 minutes. *Def's Ex. 31.*

### Evaluation of Each Study, Court's Findings

148. Dr. Radwin's study was a practical real-time evaluation of the donning and doffing process.

149. Because Dr. Radwin's study measured real time donning and doffing, it naturally included time in which some employees loitered around the plant before their shifts began.

150. Dr. Radwin's study included employees who moved slowly and employees who moved quickly during the donning and doffing, walking, and sanitizing process. *See Def's Ex. 32.*

151. Dr. Davis compared his results with Dr. Radwin's for the amount of time required for donning and doffing, walking, and sanitizing for two employees that Dr. Radwin had video recorded and studied. *See Def's Ex. 32, Def's Ex. 33.*

152. In the video titled CAMA–d200803t18–080344, Dr. Radwin measured the total donning and doffing, walking, and sanitizing time to be 20.685 minutes while Dr. Davis measured the total donning and doffing, walking, and sanitizing time to be 4.97 minutes. *See Def's Ex. 32, Def's Ex. 33.*

153. In the video titled CAMA–d20080320t54350, Dr. Radwin measured the total donning and doffing, walking, and sanitizing time to be 5.414 minutes while Dr. Davis meas-

ured the total donning and doffing, walking, and sanitizing time to be 3.0 minutes. *See Def's Ex. 32, Def's Ex. 33.*

154. Dr. Davis criticized Dr. Radwin's study for being an unrealistic portrayal of the employees' activities because, under the observation effect (i.e., subjects behave differently because they are subjects), the employees probably behaved differently than they normally did when they were videotaped. *Davis Testimony, 3/26/09.*

155. I do not credit this criticism of Dr. Radwin's study.

156. Dr. Davis characterized Dr. Radwin's approach as human factors/ergonomics/biomedical approach and his own approach as a work measurement/time study approach. *Davis Testimony, 3/26/09.*

157. Dr. Davis' study was an academic, rather than a real time, exercise that excluded washing, sanitizing and waiting time.

158. Dr. Davis' donning and doffing study does not reflect the employees' normal donning and doffing process because the study was conducted in a conference room where all required PPE were laid out on a table ready for donning, much in contrast to the employees' day-to-day activities of walking and retrieving PPE from various locations.

159. Although Dr. Davis' walking study is statistically sound, it is based on a model that does not take into account the realities of the employees' work, which includes waiting, traveling in congested hallways, and walking to various locations, like the supply room, to obtain PPE items.

160. Dr. Davis' sampling of participants for the donning and doffing study is not random because (1) he

excluded any members of the plaintiff class and (2) plant supervisors hand-picked the employee participants. *Davis Testimony, 3/26/09.*

161. I find that the donning and doffing process begins when the employees first obtain their smocks.

162. Moreover, I find that the actual total donning and doffing and walking time is 17 minutes, allowing for a reasonable discount in Dr. Radwin's analysis for laggards and outliers, and to account for any de minimis exclusions. *See infra p. 43.*

**Willfulness Allegation and Good Faith Defense**

163. In its 1998 Compliance Survey of poultry processing plants, the Department of Labor ("DOL") found 50% of companies out of compliance with FLSA compensation requirements vis-a-vis donning and doffing and lunch periods. *Testimony of Michael Tirrell ("Tirrell Testimony"), 3/24/09, Pl's Ex. 20(d).*

164. DOL did not include Mountaire in its 1998 Compliance Survey. *Pl's Ex. 20(d).*

165. DOL conducted another Compliance Survey of poultry processing plants in 2000. *Tirrell Testimony, 3/24/09; Pl's Ex. 12, Def's Ex. 29.*

166. DOL included Mountaire's North Carolina plant in the 2000 Compliance Survey. *Pl's Ex. 20(d), Pl's Ex. 25, Def's Ex. 29.*

167. Mountaire's compensation policy in its North Carolina plant is the same for the Millsboro, Delaware, plant. *Pl's Ex. 20(d).*

168. Sometime in 2000, the National Chicken Council, a trade organization to which many members of the poultry industry belong, hired David Wylie, Esq., in order to get legal counsel regarding the FLSA compensation requirements for donning and doffing. *Pl's Ex. 20(g); Pl's Ex. 20(h).*

169. On February 2, 2000, David Wylie sent a memorandum ("2/2/00 Wylie Memo") to Mountaire Vice President of Plant Operations Michael Tirrell indicating that DOL inspections were underway and that Sanderson Farms, a poultry company, had been sued in a private class action under the FLSA for the company's failure to compensate employees for time spent donning and doffing. *Def's Ex. 19.*

170. On February 24, 2000, David Wylie sent another memorandum ("2/24/00 Wylie Memo") to Michael Tirrell indicating that DOL began Phase II of its inspections and that Cagle's, a poultry company, had also been sued in a private class action under the FLSA for the company's failure to compensate employees for time spent donning and doffing. *Def's Ex. 20.*

171. On March 17, 2000, David Wylie sent another memorandum ("3/17/00 Wylie Memo") to Michael Tirrell regarding the DOL survey. *Pl's Ex. 24.*

172. The 3/17/00 Wylie Memo explains that "it would not be inconceivable for USDOL to propose back pay in the amount of $750,000 or more for such alleged violations relating to donning and doffing clothing and equipment, washing and sanitizing, and standing in line for time clocks, sinks, supply rooms, etc". *Pl's Ex. 24.*

173. The 3/17/00 Wylie Memo explains DOL's position that "any work time that cuts into the 30–minute unpaid bona-fide meal period renders the entire 30–minute meal period compensable if employees do not receive the entire break time allotted." *Pl's Ex. 24.*

174. In its 2000 Compliance Survey of poultry processing plants, the DOL found 100% of companies out of compliance with FLSA compensation requirements vis-a-vis donning and doffing and lunch periods. *Tirrell Testimony, 3/24/09; Pl's Ex. 12.*

175. On May 24, 2002, DOL's Wage and Hour Division sent a letter to John Wise, General Manager of Mountaire Farms, indicating that Mountaire's failure to pay for donning and doffing violated the FLSA. *Pl's Ex. 10.*

176. Mountaire personnel refused to change its compensation practices after receiving the May 24, 2002, letter from DOL because they believed that DOL's interpretations of the FLSA were incorrect. *Pl's Ex. 20(e)* ("Well, we believe that the Department of Labor has the authority to interpret, but we didn't think that their interpretation was correct. And I believe that there were no fewer than four lawsuits brought by both the Department of Labor and private plaintiffs that were found in favor of the company that donning and doffing was not compensable."); *Tirrell Testimony, 3/24/09.*

177. On May 28, 2002, David Wylie sent a letter to poultry industry officials attached to various documents including recent donning and doffing court decisions, a list of pending FLSA class action lawsuits, information regarding a consent agreement entered into by DOL and Perdue Farms, as well as legal materials from a law firm website.

178. In a September 9, 2002 memorandum, Michael Tirrell, wrote to Wise that the Department of Labor (1) contends that employees should be paid for donning and doffing, (2) indicates that the 30–minute lunch break is compensable because the donning and doffing reduces the actual lunch period, and (3) asserts that Mountaire has committed a recordkeeping violation for failing to account for and compensate donning and doffing time. *Pl's Ex. 16.*

179. On November 8, 2005, the Supreme Court issued its *IBP, Inc. v. Alvarez*, 546 U.S. 21, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005), decision, which held that (1) time spent walking is compensable if the walking occurs after the first principal activity has commenced (e.g., donning) and before the last principal activity ceases (e.g., doffing) and (2) time spent waiting in line to obtain supplies for work is not compensable.

180. On November 28, 2005 David Wylie sent Mountaire personnel a memorandum ("11/28/05 Wylie Memo") interpreting the *Alvarez* decision. *Pl's Ex. 14.*

181. The 11/28/05 Wylie Memo explained that "if the employer requires an employee to be at a location, one designated by the employer *at a specific time,* the employee may be considered as being required to be on the clock at that time, which could thus mean such time waiting would require compensation." *Pl's Ex. 14.*

182. The 11/28/05 Wylie Memo suggests that, as a response to *Alvarez,* Mountaire could modify its pay practices to include all donning and doffing activities and walking time as compensable. *Pl's Ex. 14.*

183. The 11/28/05 Wylie Memo suggests that *Alvarez* could be interpreted to mean that "the time clock begins when the employee touches the first piece of protective gear and begins the donning process and continues throughout the 'continuous work day' until that employee removes all that equipment or clothing at the end of the work day." *Pl's Ex. 14.*

184. On April 12, 2006, DOL's Wage and Hour Division sent a letter to Ronald M. Cameron, President and CEO of Mountaire Farms, indicating that (1) donning and doffing and walking time are compensable, (2) the Supreme Court's *IBP, Inc. v. Alvarez decision*, 546 U.S. 21, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005), supports DOL's position, and (3) Defendants' failure to pay for such time in its North Carolina plant is in violation of the FLSA. Pl's Ex. 11.

185. On May 31, 2006, DOL issued "Wage and Hour Advisory Memorandum No.2006–2" ("May 2006 Advisory Memo"). *Pl's Ex. 9.*

186. DOL's May 2006 Advisory Memo explained the Supreme Court's holding in *IBP v. Alvarez*, 546 U.S. 21, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005); particularly, that "employees who work in meat and poultry processing plants must be paid for the time they spend walking between the place where they put on and take off protective equipment and the place where they process the meat and poultry" because "donning and doffing gear is a 'principal activity' " and, under the continuous work day rule, any activity done between the first and last principal activity is compensable. *Id.*

187. DOL's May 2006 Advisory Memo emphasized the department's position that obtaining gear (as opposed to waiting to obtain gear) "required to be stored on the [employer's] premises" begins the compensable work day. *Id.*

188. On July 17, 2006, Mountaire changed its policy to allow employees to take their smocks home as a response to (1) Wylie's interpretation of *Alvarez* and (2) DOL's advisory memoranda clarifying that donning and doffing are integral and indispensable to chicken processing and therefore,

compensable under FLSA. Def's Ex. I.

189. On July 24, 2006, Michael Tirrell sent an email ("Tirrell Email") to various company personnel indicating that the smock take-home policy allowed the employee to put them on at the employee's discretion, thereby "effectively eliminate[ing] the donning and doffing issue." *Pl's Ex. 15.*

190. The Tirrell Email also indicated that Mountaire personnel "should have begun moving the hand wash sinks out to the dept areas to delay the 'first principal activity' until the line started." *Pl's Ex. 15.*

191. Everett Brown, a Mountaire employee replied to the Tirrell Email indicating that employees understood the take-home policy but most are not taking the option of taking their smocks home. *Pl's Ex. 15* ("At this point we have talked with each employee and they are signing their name saying they understand they have the option to take the coat or not take the coat. Most are not taking the coat and don't want it the night before. However as with all their other equipment they have the option.").

192. Dr. Davis testified that, during the course of his studies at the plant, he had not seen anyone taking a smock home. *Pl's Ex. 4(f); Davis Testimony, 3/26/09.*

193. Mountaire does not keep track of the time that employees spend donning and doffing, walking and sanitizing. *Pl's Ex. 20(e); Tirrell Testimony, 3/24/09.*

194. Michael Tirrell was aware that Perdue Farms had entered into a consent decree agreement with DOL wherein Perdue agreed to compensate employees for donning and doffing time. *Pl's Ex. 20(f); Pl's Ex. 20(k); Tirrell Testimony, 3/24/09.*

## II. CONCLUSIONS OF LAW

This court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b). The class members were/are employees engaged in commerce and the production of goods for commerce as those terms are used in Sections 6 and 7 of the FLSA, 29 U.S.C. § 206–07; thus, the Defendant-employers are subject to the overtime provisions of 29 U.S.C. § 207. Venue is proper in this district and this division under 28 U.S.C. § 1391.

There were seven distinct issues presented at trial:

1. Are donning and doffing integral and indispensable to the principal activities of chicken processing, thereby making time spent donning and doffing compensable under the FLSA?

2. Are donning and doffing activities during the meal break compensable?

3. How much time do employees spend on donning and doffing per day?

4. Does the fact that employees are able to take home their smocks mean that donning and doffing are not principal activities?

5. Is the amount of time that employees spend donning and doffing so miniscule compared to their work day that such time is de minimis?

6. Did Defendants act in good faith in failing to compensate employees for donning and doffing time?

7. Did Defendants act willfully in failing to compensate employees for donning and doffing time?

I will address these issues in turn.

### I. Compensability of Donning and Doffing under the FLSA

#### A. Donning and Doffing as Work

The FLSA was enacted "to protect employees from detrimental labor conditions and provide for the general well being of workers." *Monahan v. County of Chesterfield,* 95 F.3d 1263, 1267 (4th Cir.1996). The goal is to provide employees with "a fair day's pay for a fair day's work." *Id.; Alvarez,* 339 F.3d 894, 902 (9th Cir.2003). The Supreme Court has said "work" is the "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 598, 64 S.Ct. 698, 88 L.Ed. 949 (1944). In a Memorandum and Order filed on March 9, 2009 in this case, I ruled that donning and doffing PPE constituted "work" because donning and doffing require physical and mental exertion controlled and required by Defendants.

### B. Compensability of Donning and Doffing

In 1947, Congress passed the Portal–to–Portal Act, which exempted from the scope of *compensable* "work" those activities that are preliminary or postliminary to principal activities. Exemptions to the FLSA, such a pre- and postliminary activities, "are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960).

The DOL has defined "work day" as "the period between the commencement and completion on the same work day of an employee's principal activity or activities." 29 C.F.R. § 790.6(a), (b). "[T]o the extent that activities engaged in by an employee occurs after the employee commences to perform the first principal activity on a particular work day and before he

ceases the performance of the last principal activity on a particular work day," those activities are not exempted from FLSA and are compensable. *Id.* Thus, under the "continuous work day" rule, any activity—donning and doffing, walking, waiting, sanitizing—undertaken by the employee after the work day has begun is compensable. *See IBP, Inc. v. Alvarez,* 546 U.S. at 28–29, 126 S.Ct. 514.

 The Supreme Court has held that activities that are "integral and indispensable" to principal activities are themselves principal activities—not pre- or postliminary—and are therefore compensable under the FLSA. *Steiner v. Mitchell,* 350 U.S. 247, 256, 76 S.Ct. 330, 100 L.Ed. 267 (1956) ("activities performed either before or after the regular work shift, on or off the production line, are compensable . . . if those activities are an integral and indispensable part of the principal activities"). In my March 9, 2009 Memorandum and Order, I discussed the various approaches adopted by different circuits in defining the types of activities that are "integral and indispensable" to principal activities. In the end, I chose to follow the Ninth Circuit's two part test: that donning and doffing of unique and non-unique protective gear are "integral and indispensable" if doing so is (1) necessary to the principal work performed and (2) done for the benefit of the employer. *See Alvarez,* 339 F.3d at 902–03. However, I left for determination at trial the specific question of whether donning and doffing PPE is "integral and indispensable" to the principal work of chicken processing. I find and conclude that it is.

 First, donning and doffing is necessary to the principal work of chicken processing. It is undisputed that all employees are required to wear the following items no matter the department in which they work: wear plugs, bump caps, smocks (also called coats), hair/beard nets, and steel toed rubber boots. These items are required by Mountaire company policy, United States Department of Agriculture ("USD A") sanitary regulations, and Occupational Safety and Health Administration safety requirements ("OSHA"). For example, OSHA requires employees to wear ear plugs to protect the employees' ears. Different ear plugs have different OSHA ratings and employees are required to wear specific ear plugs depending on which section of the plant they work and how noisy that section is.

Other PPE items are required in order to keep the chickens clean. According to Alan Zlotorynski, a human resources manager at a different Mountaire plant, Mountaire requires employees to wear bump caps not to protect employees from actually bumping their heads, but because bump caps prevent employees' hairs from falling into the products. The bump caps are not made of the same grade or quality of a helmet that prevents head injuries when worn. The primary purpose of the bump caps is to protect the product. The same may be said for hair and beard nets. In addition, employees must don and doff smocks, aprons, and gloves to safely handle chickens. Employees are not allowed to take smocks, aprons, or gloves into restrooms for sanitary reasons. Employees are likewise prohibited from taking aprons into the cafeteria. Shitwa Perez, an employee in the evisceration, salvage, and debone department, testified that an inspector specifically told her to replace her smocks to prevent contaminating the food. I credit this testimony. Clean smocks are so integral to chicken processing that the company launders the smocks daily and provides them to the employees on racks in easily accessible hallways.

Defense witnesses testified that everyone entering the production floor is required to wear all of these listed PPE items. But, the fact that everyone is re-

quired to wear these PPE items does not negate the fact that wearing them is required for chicken processing at Mountaire. Donning and doffing the required PPE are paramount to complying with federal regulations as well as producing safe products. Indeed, donning and doffing is so important to the work done at Mountaire that employees are subject to discipline or termination for failing to comply with donning requirements.

Other PPE that are not *per se* required by Mountaire are no less necessary for chicken processing. The workers testified during trial that they must wear clean cotton gloves in order to properly do their work. Mountaire does not require employees to wear cotton gloves; however, I find that cotton gloves are necessary to the principal work of chicken processing. Ray Barrientos, for example, worked on the Evisceration department. Workers in this department process chickens that have recently been dipped in scalding water and plucked. When the chickens arrive at his work station, therefore, the chickens are extremely hot and difficult to handle. Barrientos, and others on his line, are required to hang 45 chickens per minute. During cross-examination, Barrientos did admit that he *may* be able to perform his work without cotton gloves. Without the gloves, however, it would be impossible to hang the chickens properly at the pace required by Mountaire.

Luisa Perez, who worked in the breast debone department, encountered a different problem than Ray Barrientos. The temperature in the debone department was kept at 45 ° F. She had to wear fabric gloves under her mesh gloves in order to keep her hands warm. Moreover, she needed clean gloves to hold the knives safely because the blood and fat from the chickens made the knives extremely slippery. Cold hands make using knives, scissors, and other cutting equipment more dangerous to use. It is extremely clear that the PPE items are necessary to processing chickens properly.

Second, donning and doffing is done for the benefit of Defendant-employers. Michael Tirrell summarized the benefits of donning and doffing well. He testified that employees benefit from donning and doffing the PPE items inasmuch as the PPE items protects employees from workplace hazards. He also testified that Mountaire benefits from the employees' donning and doffing because the PPE protects the products from contamination, helps keep workers compensation payments down, keeps missed time to a minimum, and shields the company from pain and suffering payments. I find and conclude that Mountaire is the primary beneficiary of the donning and doffing.

## C. Take Home Option

In May 2006, DOL issued an advisory opinion stating that "if employees have the option and ability to change into the required gear at home, changing into the gear is not a principal activity, even when it takes place at the plant." DOL Wage & Adv. Mem. No.2006–2 (May 31, 2006).[1] In

1. The same memorandum includes a footnote which reads, "Since, like donning, obtaining the gear (as opposed to waiting to obtain the gear) 'is always essential if the worker is to do his job,' the compensable day starts once the employee has obtained the gear required to be stored on the premises by taking items out of a bin, a locker or another designated storage area." Defendants would have the court read the phrase "required to be stored on the premises" strictly. They argue that, because PPE items are not required to be kept at the plant, the compensable day does not start when the employee dons PPE. I decline to read the DOL footnote so strictly. I find and conclude that the phrase "required to be stored on the premises" has a more practical meaning. The PPE were required to be stored at the premises because Mountaire gives each employee a locker in which to store all of the PPE and because, in reality,

*Abbe v. City of San Diego*, the Southern District of California granted the city's summary judgment motion because it could find "no evidence that its officers were required by law, policy, or the nature of their work to don and doff their uniform or safety equipment at work." 2007 WL 4146696 at *7 (S.D.Cal. Nov.9, 2007). The Northern District of California, on the other hand, concluded that donning and doffing may be compensable even if performed off the employer's premises because "the location of the donning and doffing activity [should] be only one of the considerations" in determining if an activity is compensable. *Lemmon v. City of San Leandro*, 538 F.Supp.2d 1200, 1207 (N.D.Cal.2007). The important question is whether employees "actually have a meaningful opportunity to don their protective gear at home, or instead, whether that option is illusory." *Martin v. City of Richmond*, 504 F.Supp.2d 766, 775 (N.D.Cal.2007).

■ Defendants assert that employees have the option of taking home all of their PPE items; thus, donning and doffing cannot be a principal activity per DOL's advisory opinion. I disagree. This case differs from *Abbe* in that Mountaire employees are required by law, policy, and the nature of the work to don and doff their PPE at work. More importantly, I find the take home option illusory. Employees are provided with lockers. Any employee who requests a locker receives one. Employers recently expanded the number of employee lockers. If changing at home were a bona fide option, there would be no real need for employee lockers or for Defendants to incur the costs of installing them. While employees are required to clean out their lockers on Fridays, they keep all of their PPE items in the lockers during the week. Dr. Rad-

win's videos show employees storing their PPE items in their lockers at the end of the day, rather than taking those items home. As a practical matter, it would be onerous and indeed impractical for employees to take home a host of PPE (ear plugs, bump caps, smocks, aprons, hair/ beard nets, and steel toed rubber boots) everyday when they have the option and ability to leave them in their lockers at the plant.

While Tirrell testified that he has seen employees driving around town with all of their PPE on, this particular incidence happens once in a "blue moon." And it certainly does not happen in the middle of a humid Delaware summer. Furthermore, employees were not allowed to take smocks home prior to July 9, 2006. The normal order of donning is as follows: the smock goes on first, followed by the apron, the arm sleeves, and gloves. The smock is the foundation of the PPE. It must be in place before other gear can be donned. Complete donning for work, therefore, cannot be achieved until the lab coat is donned. So, even if employees were taking their PPE home before July 9, 2006, they could not commence the donning process until after they arrived at the plant.

Defendants emphasize that employees were allowed to take smocks home beginning on July 9, 2006. This fact does not strengthen Defendants' take home defense. First, it is wholly illogical for employees to take home smocks soiled with chicken blood and fat when the company (1) provides hampers, close to the exits, in which employees may place the soiled smocks, (2) launders the smocks free of charge, and (3) provides clean smocks, arranged neatly on racks that are easily accessible at the plant hallways, at the

employees keep their PPE in their lockers, thereby making the option to take PPE home,

illusory.

beginning of the shifts. Second, it is plausible that employees take home clean smocks at the end of their shifts, before they go home; however, no witnesses have testified that this is a normal occurrence. To the contrary, Defendants' expert Dr. Davis testified during deposition and at trial that he did not see anyone taking a smock home at the end of the day in the two separate weeks in which he conducted his study at Millsboro. The workers testified during trial that they all pick up smocks at the beginning of their shifts. Indeed, Dr. Radwin's videos also confirm that the majority of employees pick up smocks at the beginning of their shifts. Zlotorynski also testified to this effect during depositions.

Third, even if employees do take clean smocks home at the end of the day, employees keep the rest of their PPE in their lockers so they would still need to report to the plant in advance of the start of line time to finish donning all of their PPE. It is quite clear that Mountaire employees did not "actually have a meaningful opportunity to don their protective gear at home." *Martin,* 504 F.Supp.2d at 775. The take home option is illusory.

Defendants' motivation for enacting the smock take home policy also bolsters the conclusion that the take home option is illusory. Tirrell's email to various company personnel indicated that the smock take-home policy was designed to "effectively eliminate the donning and doffing issue." This same email also indicated that Mountaire personnel "should have begun moving the hand wash sinks out to the dept areas to delay the 'first principal activity' until the line started." Clearly, the decisions to institute the smock take home policy and moving the sinks closer to the production floor were motivated by Mountaire's desire to circumvent DOL's persistent directives that Mountaire must compensate employees for donning and doffing

time. The same email thread, however, highlights the fact that the take home option is illusory. Replying to Tirrell's email, Everett Brown, a Mountaire employee, wrote, "At this point we have talked with each employee and they are signing their name saying they understand they have the option to take the coat or not take the coat. Most are not taking the coat and don't want it the night before. However as with all their other equipment they have the option." This exchange elucidates Defendants' position: that the important thing is that employees have a take home option, and not that the option is meaningful.

### D. Meal Breaks

■■ Bona fide meal periods are non-compensable:

> bona fide meal periods are not work time ... The employee must be completely relieved from duty for purposes of eating regular meals ... The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.

29 C.F.R. § 785.19(a) (2009). Under Fourth Circuit law, "[t]ime spent predominantly for the employer's benefit during a period, although designated as a lunch period or any other designation, nevertheless constitutes working time compensable under the provisions of the Fair Labor Standards Act." *Roy v. County of Lexington,* 141 F.3d 533, 544–45 (4th Cir.1998) (*quoting F.W. Stock & Sons, Inc. v. Thompson,* 194 F.2d 493, 496 (6th Cir.1952)). Whether a meal break is predominantly for the benefit of the employer is a factual determination. *See Beasley v. Hillcrest Med. Ctr.,* 78 Fed.Appx. 67, 70 (10th Cir.2003); *Bernard v. IBP, Inc.,* 154 F.3d 259, 265 (5th Cir.1998) ("Whether meal time is predominantly for the benefit of the employer is a question of fact that is ordinarily

resolved by the trier of fact after hearing all of the evidence.").

In *Roy v. County of Lexington,* the Fourth Circuit held that that Lexington County Emergency Medical Service (EMS) employees were not entitled to compensation for their meal breaks because the EMS employees had no official responsibilities during their meal breaks other than to respond to emergency calls. 141 F.3d at 545–46. The Fourth Circuit contrasted the meal break duties of EMS employees to the "office employee who is *required to eat at his desk* or a factory worker who is *required to be at his machine.*" *Id.* (quoting 29 C.F.R § 785.19(a)). EMS employees had their meal breaks interrupted for emergency calls only 27% of the time. *Id.* at 546.

█ Here, Defendants urge this court to look at the 36–minute meal break as a whole. They argue that, because the employee garners the predominant benefit of the 36–minute meal break, the whole meal break should be non-compensable. Plaintiffs, on the other hand, ask the court to parse the various activities during meal breaks. While employees are the predominant beneficiary of the meal breaks, they spend a portion of the allotted 36–minutes donning and doffing. And, once it has been determined that donning and doffing time is compensable, it would be unfair to artificially "turn off the clock" when the company says that lunch time has started. After all, the donning and doffing is required by Defendants. I agree with Plaintiffs.

The portion of the meal breaks in which employees don and doff PPE is compensable because (1) it is done for the employer's benefit and (2) it is required by the employer. Plaintiffs sanitize and doff their PPE before heading to the cafeteria at the beginning of the lunch break then re-don and sanitize their PPE before heading to the production floor at the end of the lunch break. Employees usually doff their aprons and gloves during the lunch break, placing their aprons on hooks in the hallways. These activities benefit Defendants because they help Defendants limit their products' exposure to bacteria and ensure that products are uncontaminated and clean. The donning and doffing and sanitizing also benefit Plaintiffs. Although not required, almost all employees sanitize their aprons, boots, and gloves before leaving the production area for their lunch break so that they may eat without blood and other chicken products on their persons. In the aggregate, however, I find and conclude that the benefit to Defendants outweigh the benefits to Plaintiffs.

Moreover, the donning and doffing and sanitizing are required by Defendants. Employees *must* wear the required PPE on the production floor. Employees *must* also wash their hands and/or sanitize their PPE by walking through a foot bath, dipping their gloves into a sanitizing solution, and splashing sanitizing solution on their aprons. These activities are not optional—they are required, just as in the Fourth Circuit's examples of the office worker required to eat lunch at his desk or factory worker required to be at his machine. Employees who do not don and doff or sanitize properly are subject to discipline, even termination.

Unlike the EMS employees in *Roy,* Plaintiffs are not seeking to be compensated for the whole meal break. Plaintiffs here seek compensation only for the time spent donning and doffing and sanitizing at the beginning and end of the meal breaks. I see no reason why the doffing/sanitizing time spent at the beginning of the meal break and the donning/sanitizing time at the end of the meal break cannot be separated from the time that the employees actually spend on a bona fide meal. This scenario is not foreclosed by *Roy. Roy*

does not mandate that the court look at the meal break as a whole and blindly determine the primary benefit of all employees activities during lunch. Indeed, the Fourth Circuit "believe[s] the most appropriate standard for compensability is a 'flexible and realistic' one where we determine whether, on balance, employees use their mealtime for their own, or for their employer's benefit." *Id.* at 545.

Further, DOL's Findings following the 2000 Survey of poultry plants support the parsing out of the various activities during meal breaks. DOL Poultry Processing Compliance Survey Fact Sheet (January 2001). The DOL Survey found "extensive" FLSA violations in which employees were not being compensated for donning and doffing during meal breaks:

> The most common and significant findings involved plant employees not being compensated for time spent at the beginning of shifts putting on and sanitizing required gear and equipment, and at the end of shifts, removing and cleaning these same items. Similarly, this gear had to be removed and cleaned at the start of meal periods, and then, prior to returning to work on the line after meal periods, the workers had to again put on, sanitize, and often wait, and then walk to their individual line positions. Time spent in these work activities during meal periods resulted in employees not receiving bona fide—and therefore non-compensable—meal periods.

*Id.* This scenario described by DOL is exactly the situation at the Millsboro plant. Thus, I find and conclude that the time spent donning and doffing and sanitizing at the beginning and end of meal breaks to be compensable. The evidence shows that this time is easily calculable. *See infra* Part II.

### E. Continuous Work Day

■ "[D]uring a continuous work day, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of that provision, and as a result is covered by FLSA." *IBP v. Alvarez*, 546 U.S. 21, 37, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005). The Department of Labor has embraced this view: "*Alvarez* thus clearly stands for the proposition that where the aggregate time spent donning, walking, waiting and doffing exceeds the de minimis standard, it is compensable." DOL Advisory Letter, p. 4 (May 2006). Because the initial donning at the beginning of the day is "integral and indispensable" to chicken processing, that action is itself a principal activity and marks the beginning of the continuous work day. *See Alvarez*, 546 U.S. at 33, 126 S.Ct. 514. Similarly, the doffing at the end of the day is a principal activity marking the end of the continuous work day. I find and conclude that any activity that occurs between the initial donning and final doffing (e.g., walking, sanitizing, picking up tools, etc.) is compensable. *Id.*

### II. Total Time Spent on Donning and Doffing

■ The respective studies conducted by Drs. Radwin and Davis have much to commend. In determining the amount of time employees at the Millsboro plant spend on donning and doffing, I opt for a "flexible and realistic" approach. *See Roy*, 141 F.3d at 545. With this in mind, I decline to accept Dr. Davis' conclusions regarding donning and doffing. Dr. Davis' studied donning and doffing and walking in a vacuum, not taking into account a continuous work day. *See Alvarez*, 546 U.S. at 28–29, 126 S.Ct. 514. First, Dr. Davis did not study the time required to don or doff

boots because counsel for Mountaire instructed him to not do so. Boots are required for all Mountaire employees, so Dr. Davis' observed mean donning and doffing times are necessarily underinclusive without the boots. From this alone, I find Dr. Davis' mean doffing and donning time—3.3 minutes—to underestimate the actual donning and doffing time.

Second, Dr. Davis' donning and doffing study was conducted in a conference room in which all PPE items were laid out in front of the employee-participants and the employees could simply pick up a PPE item and don it while being timed with a stop watch. This unrealistic scenario fails to take into account the employees' real-life experiences. Employees do not pick up and don all of their PPE from one location. The videos presented at trial show very clearly that most employees pick up smocks from a rack in the hallway, gather some of their PPE items from their lockers, and sign out some PPE from the supply room, not to mention walk around the plant and sanitize the PPE before arriving at their work stations.

Third, Dr. Davis criticized Dr. Radwin's study as being unrealistic because of the observer phenomenon, meaning that subjects act as subjects (and not as themselves) when they know they are being studied. This same criticism applies to Dr. Davis' study. Employee-participants were closeted in a conference room with Dr. Davis and Humberto Aristazabal, a Mountaire Human Resources manager, who acted as a translator. Dr. Davis and Aristazabal interacted with the employee-participants for several minutes before the actual trials began, going over instructions and gathering biographical data. These employee-participants knew they were subjects in Dr. Davis' experiment; therefore, according to Dr. Davis' own criticism, they acted as subjects.

Fourth, all of the 57 trials excluded by Dr. Davis were on "the high side," meaning that Dr. Davis invalidated only times that were greater than average. Finally, Dr. Davis' study did not have a random sampling of employees. According to Dr. Davis, company supervisors/managers randomly selected employees for the donning and doffing study, although it is unclear what method they used to select these individuals. Dr. Davis also rejected from the study any member of the plaintiff class. I find this method of selecting participants to be far from random.

Similarly, Dr. Davis did not use any employees in his walking study. Instead, he used a blueprint of the plant, measured distances from specific points in the plant, and, with a statistical benchmark for average walking speed, calculated the amount of time it takes to walk from those specific points. Dr. Davis' model is to be commended for taking into account wet and dry conditions, as well as various impediments to continuous walking, such as steps and doors. On the other hand, I am particularly concerned that his study did not take into account the amount of foot traffic, which, according to the evidence at trial, is fairly heavy at the beginning and end of shifts. One particular video showed a young woman experiencing difficulty in navigating around the locker room and hallways as she walked from point to point gathering her PPE because of the crowded conditions. *See Pl's Ex. 18.* In addition, Dr. Davis' walking study does not take into account waiting and sanitizing time. The videos show that employees wait in line to sanitize their PPE. Thus, I find and conclude Dr. Davis' walking time of 6.9 minutes per shift to be an underestimation of the actual walking time.

■ Dr. Radwin's study, on the other hand, reflects a continuous work day. Dr. Radwin had a truly random sampling of

participants going about their normal work day. Dr. Radwin had four videographers stationed near plant entrances simultaneously videotape employees picked by a random number generator. Videotapes were made during the various times of day and night when each shift performed donning and doffing activities and at the different locations throughout the plant where donning and doffing activities took place. The study included employees working in all shifts. Donning and doffing activities were recorded in the locker rooms, hallways, plant floors or other locations in which employees acquired, donned, sanitized, and stowed PPE. Neither Dr. Radwin nor any of the videographers had any contact with the employees prior to the times in which the employees were actually videotaped. In fact, videographers were instructed to refrain from (1) approaching employees while the line was active (i.e., chicken was being processed on the line) or (2) engaging in conversation with any of the employees. Although there was a difference between the proportion of employees on the actual payroll and employees sampled in the Debone and First Processing departments, these differences were not statistically significant.

Dr. Radwin began his study from the time in which the employee being recorded first acquired a piece of PPE. He included time spent on all activities (e.g., walking, sanitizing, waiting in line) occurring between the employee's obtaining the first piece of PPE and the employee's arrival at his work station. Doffing at the start of the lunch break began when the employee being recorded departed his workstation and concluded when the employee being recorded released the last PPE. Re-donning at the end of the lunch break began when the employee being recorded obtained PPE and concluded when the employee being recorded reached his workstation on the production line and became ready for work. Doffing at the end of the shift began when the employee being recorded departed his workstation and concluded when the employee being recorded released the last PPE, thereby including all activities (e.g., walking, sanitizing, waiting in line) in between. Dr. Radwin's study did exclude the time that employees spend (1) in the bathroom, (2) in the cafeteria, and (3) waiting at a workstation for the production line to begin.

Dr. Radwin's task measurement software allowed him to scroll through the video (i.e., freeze, advance, reverse) in order to identify the precise frame, and thus, time period, in which the beginning or end of the donning and doffing activities occurred. Dr. Radwin's study measured real time donning and doffing; therefore, it naturally included time in which some employees loitered around the plant before their shifts began. In fact, one particular video showed an employee who moved sluggishly, much more slowly than others and loitered around the plant for a substantial period of time before his shift started. *See Pl's Ex. 18.* On the other hand, Dr. Radwin's study also included employees who moved quickly during the donning and doffing, walking, and sanitizing process. *See Pl's Ex. 18.* I find Dr. Radwin's total donning and doffing time of 20.879 minutes to be a slight overestimation of the total time.

I find and conclude that the total time spent donning and doffing, sanitizing, and walking during the continuous work day is 17 minutes. As explained above, these 17 minutes of pre-shift activities are integral and indispensable to the principal work of chicken processing and are therefore compensable. The 17 minutes will apply to all employees, because it is derived from Dr. Radwin's study, which included employees from all departments.

## III. De Minimis

■ "As a general rule, employees cannot recover for otherwise compensable time if it is *de minimis*." *Lindow v. United States,* 738 F.2d 1057, 1061–62 (9th Cir.1984). In fact,

> When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

*Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 692, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). As the Supreme Court noted in *Mt. Clemens Pottery,* the precise amount of time that may be considered de minimis is ultimately question for the trier of fact. *Mt. Clemens Pottery,* 328 U.S. at 692, 66 S.Ct. 1187. *Lindow v. United States,* the most cited case on this issue, weighs three factors in determining whether a claim is too small for recovery: (1) the practical administrative difficulty in recording the time, (2) the size of the aggregate claim, and (3) the regularity of the additional work. 738 F.2d at 1063.

■ First, the experts in this case show that the time spent on donning and doffing are calculable. Second, although this case has been bifurcated (into liability and damages), it is apparent that the aggregate claim is sufficiently large. Approximately 280 Millsboro employees have opted into this case. These employees were paid at a rate of $10 per hour. Their claims go back to 2003 and continue to the present. For one year alone (at a loss of 15 minutes per day), an employee would be entitled to $625 in damages. If doubled by the appropriate FLSA penalty, each employee would be entitled to $1250 annually. The annual loss for 280 workers would be about $350,000. Third, the unpaid work was regular and repeated itself daily. Thus, the amount of time at issue here is not de minimis.[2]

To the extent that the time spent donning and doffing certain PPE items may be excludable from compensable time because of the de minimis rule, *see Alvarez,* 339 F.3d at 903–904, I have already discounted time from Dr. Radwin's mean observed time to account for such exclusion.

## IV. Willfulness and Good Faith

■ The FLSA, 29 U.S.C. § 216(b), provides for liquidated damages equal to back pay. Under 29 U.S.C. § 255(a), the statute of limitations provision for bringing a FLSA claim is two years after the cause of action accrues; however, where the FLSA violation is willful, the statutes of limitations becomes three years. To establish willfulness, the plaintiff must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). Plaintiffs point to DOL letters to Mountaire personnel as well as to a string of internal Mountaire emails in their attempts to establish will-

---

**2.** Some courts have suggested that an activity is de minimis if it does not exceed 10 minutes. *See Spoerle, v. Kraft Foods Global, Inc.,* 527 F.Supp 2d 860, 868 (W.D.Wis.2007); *Reich v. IBP, Inc.,* 38 F.3d 1123 (10th Cir.1994). No court has explained why 10 minutes should be the benchmark for de minimis purposes. *See Spoerle,* 527 F.Supp.2d at 868 ("no court has explained why 10 minutes of work is worthy of compensation but 9 minutes and 59 seconds is not"). Even if this court were to accept the 10 minute rule, however, the amount of time at issue in this case exceeds 10 minutes; therefore, it is not de minimis.

fulness. First, DOL included Mountaire's North Carolina plant in its 2000 Survey. Mountaire's compensation practices in the North Carolina plant are similar to its practices in the Millsboro, DE plant. The 2000 Survey found all plants, including Mountaire's, to be out of compliance with the FLSA because the companies did not pay employees for time spent donning and doffing. On May 24, 2002, DOL's Wage and Hour Division sent a letter to John Wise, General Manager of Mountaire Farms, indicating that Mountaire's failure to pay for donning and doffing violated the FLSA. Even after receiving this letter, Mountaire personnel refused to change its compensation practices because they believed that DOL's interpretations of the FLSA were incorrect.

Second, DOL's Wage and Hour Division sent a letter to Ronald M. Cameron, President and CEO of Mountaire Farms, on April 12, 2006, indicating that (1) donning and doffing and walking time are compensable, (2) the Supreme Court's decision in *IBP, Inc. v. Alvarez*, 546 U.S. 21, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005), supports DOL's position, and (3) Defendants' failure to pay for such time in its North Carolina plant is in violation of the FLSA.

Third, David Wylie's 11/28/05 memorandum to poultry officials states that *Alvarez* could be interpreted to mean that "the time clock begins when the employee touches the first piece of protective gear and begins the donning process and continues throughout the 'continuous work day' until that employee removes all that equipment or clothing at the end of the work day." According to Plaintiffs, Defendants were aware, as early as January 2001 (when DOL issued its findings pursuant to the Survey), that its compensations policies with regard to donning and doffing, were in violation of the FLSA.

Finally, the thread of emails between Michael Tirrell and various company personnel indicates that the smock take-home policy allowed the employee to put them on at the employee's discretion, thereby "effectively eliminate[ing] the donning and doffing issue." This same email thread advises company personnel to move the hand wash sinks out to the department areas to "delay the 'first principal activity' until the line started."

These facts are insufficient for a finding of willfulness, as defined by *McLaughlin*. *McLaughlin* requires that the employer know or act with reckless disregard in violating the FLSA. There is a difference between (1) acts and policies that amount to reckless disregard for clear legal principles and (2) acts and policies intended to avoid liability in the face of changing legal standards. The former supports a finding of willfulness. What we have in this case, however, is the latter.

The legal landscape is not yet clearly defined in FLSA donning and doffing cases. Different circuits have approached donning and doffing cases differently. For example, the Ninth Circuit used a two part test to determine whether pre- and post-shift activities are compensable. *Alvarez*, 339 F.3d at 902–903 (donning and doffing of unique and non-unique protective gear are "integral and indispensable" if doing so is (1) necessary to the principal work performed and (2) done for the benefit of the employer). The Ninth Circuit has held that donning and doffing is necessary to the principal work performed if it is required by company policy or by government regulations. *Id.* The Second Circuit, on the other hand, has held that certain generic protective items may be indispensable to principal activities without being integral and that the donning and doffing of such gear is not rendered integral by being required by the employer or government regulation. *Gorman v. The Consolidated Edison Corp.*, 488 F.3d 586, 594 (2d

Cir.2007). In the Tenth Circuit, donning and doffing of "standard gear" is not compensable. *Reich v. IBP, Inc.*, 38 F.3d 1123, 1125 (10th Cir.1994).

In the face of continued litigation as to the proper legal standards for donning and doffing cases, I decline to find Defendants' actions, which are admittedly intended to avoid liability, willful. Thus, the statutes of limitations does not extend to three years.

■ Section 260 of the Portal to Portal Act states that "if the employer shows to the satisfaction of the court that the act or omission giving rise to [a FLSA violation] was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation ... the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 16 of such Act." 29 U.S.C. § 260. The employer "bears the burden of establishing, by 'plain and substantial evidence, subjective good faith and reasonableness.'" *Reich v. Southern New England Telecomms., Corp.*, 121 F.3d 58, 71 (2d Cir.1997) (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir.1991)). This burden "is a difficult one to meet, however, and '[d]ouble damages are the norm, single damages the exception....'" *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d. Cir.1987) (quoting *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir.1986)). In fact, this burden requires "that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them." *Southern New England Telecomms.*, 121 F.3d at 71. Under 29 U.S.C. § 260, reliance upon the advice of an attorney is sufficient for denial or limitation of liquidated damages. *Blankenship v. Thurston Motor Lines*, 295 F.Supp. 632, (W.D.Va.1968) (*rev'd on other grounds* 415 F.2d 1193 (4th Cir.1969)).

The evidence here shows that Defendants relied on attorney David Wylie's advice. Defendants entered into evidence a total of 14 letters and memoranda from David Wylie in which Wylie interpreted donning and doffing cases from various jurisdictions, gave updates on DOL plant surveys, and advised poultry companies on how they may alter or maintain their company practices to remain in compliance with the FLSA, as interpreted by different courts. Defendants clearly changed its policies pursuant to Wylie's information and advice on donning and doffing issues. I therefore find that Defendants acted in good faith. Liquidated damages are inappropriate.

## V. Damages

As an initial matter, I find the testimony of the four Mountaire employees to be sufficiently, indeed, amply, representative of the plaintiff class. Representative evidence, such as that presented here, is accepted for determining liability in FLSA cases. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). Employees have the burden of demonstrating sufficient evidence that they have performed work for which they were not compensated and to produce sufficient evidence to show the amount and extent of that work "as a matter of just and reasonable inference." *Id.* Once the employees have demonstrated such evidence, the burden then shifts to the employer to produce "evidence of the precise amount of work performed or evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* If the employer fails to produce such evidence, "[t]he court may then award damages the employee[s] even though the result be only approximate." *Id.*

Here, the evidence shows that members of the plaintiff class performed work for which they were not compensated. This work occurred pre-shift, post-shift, and during portions of their meal breaks. Defendants did not keep or maintain records as to the amount of time this work actually took. Nevertheless, recovery in this case will be individualized in that each member of the plaintiff class will be entitled for compensation for donning and doffing time for each day worked.

The good faith exemption of 29 U.S.C. § 260 applies only to liquidated damages and not to attorney's fees. *Luther v. Z. Wilson, Inc.*, 528 F.Supp. 1166, (S.D.Ohio 1981). Here, attorney's fees are appropriate.

The parties shall report on or before May 15, 2009, as to further proceedings required in this case.